**MAHAFFY AND HARDER ENGINEERING COMPANY, Appellant,**

v.

**STANDARD PACKAGING CORPORATION, Appellee.**

**No. 11377.**

United States Court of Appeals
Fourth Circuit.

Argued Dec. 7, 1967.

Decided Jan. 29, 1968.

Roland T. Bryan, Stamford, Conn. (Haynes N. Johnson, Robertson, Bryan, Parmelee & Johnson, Stamford, Conn., Boothe, Dudley, Koontz, Blankingship & Stump, Alexandria, Va., and Curtis, Morris & Safford, New York City, on the brief), for appellant.

Dana M. Raymond, New York City (Eppa Hunton, IV, Richmond, Va., and Frederick C. Carver, and Brumbaugh, Free, Graves & Donohue, New York City, on the brief), for appellee.

Before SOBELOFF, BOREMAN and BRYAN, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge:

Patent No. 3,125,839, to be designated as 839, covering an element of a vacuum packaging apparatus and issued to Reid A. Mahaffy and John R. Harder on March 24, 1964, upon an application filed May 3, 1962, was declared invalid by the District Judge for obviousness, lack of invention and overclaiming. Since we agree that the patented device was obvious and so lacked invention, we affirm.

The patentees' exclusive licensee, appellant Mahaffy & Harder Engineering Company, a New Jersey corporation engaged in designing and making machinery, brought an infringement suit against appellee Standard Packaging Corporation, chartered under the laws of Virginia and engaged in selling machinery. The relationship between these parties is outlined in the District Judge's opinion, 266 F.Supp. 478:

"(3) On or about September 28, 1960 Standard and Mahaffy Engineering Company entered into an agreement for the design and construction by Mahaffy Engineering of twenty frankfurter packaging machines, which defendant designated as its 6–14F machines. The machine specifications attached to the agreement provided:

'The general principles of the machine are to be similar to those of the existing MA–1 (6–14) machine excepting that the cavities are to be sized to produce packages for frankfurters, and means is to be provided for transporting the product and placing it into the cavities automatically.' "

Pursuant to the terms of this agreement, Mahaffy developed the 6–14F machine, the concern of this case. The letters patent describe the industrial background and operation of the entire machine, of which the invention-device is a part, as follows:

"In recent years, a number of automatic machines have been developed to produce evacuated or gas-filled thermoformed packages of plastic material such as combinations of polyethylene * * *. One machine of this class * * * includes a plurality of separate identical trays mounted on an endless chain which is driven with an intermittent motion past a series of packaging stations where certain operations are performed sequentially to convert thin plastic film into evacuated packages containing products such as luncheon meat, frankfurters, etc. These packaging operations basically comprise the steps of (1) applying a first film of plastic packaging material over the open top of a tray, (2) stretching this plastic material down into the tray by the application of vacuum to the bottom of the tray, (3) depositing the product to be packaged in the tray, (4) applying a second film of plastic packaging material over the top of the tray, (5) partially sealing the two plastic films together while leaving an evacuation opening, (6) evacuating the partially-sealed container through the opening, and (7) completely sealing the two films together to produce an evacuated and hermetically-sealed package with the product therein."

Though the asserted invention is not stated in the patent with the desired explicitness, it centers on operational step (2), supra, i. e., the drawing with a vacuum of a preheated flexible plastic film down into a tray so that the film conforms to and against the bottom and sides of the tray, making a pocket to receive the frankfurters. The aim of

the asserted invention is to obtain greater economy in frankfurter packaging, trimly wrapping 10 frankfurters in 1 package with only slightly more plastic film—a costly item—than previously necessary to pack 5. By maintaining the vacuum applied to the plastic film in step (2), the appellant urges, its device allows the "deep draw" of approximately 2 inches needed to pack 10 frankfurters. Although the claimed patent involves no more than a vacuum applying and maintaining device, an understanding of the machine's overall operation should be helpful in adding perspective to the small part of it specifically relevant here.

A series of metal trays, each containing two compartments, approximate squares, with sides of about five inches in length, two inches deep, and each capable of holding two layers of 5 frankfurters, intermittently move on an oval, endless chain, much as the track tread of a caterpillar tractor. When on the upper level the tray moves from right to left. As it rises to the top at the right end of the loop, it comes to a highly finished horizontal metal slide bar, which has a manifold fixed to, and running parallel along, its side. The end of the bar is slightly ramped for a few inches and, for the same distance, cut out in the center in a U-shape, creating a forklike structure. The ramp serves to ease the trays onto the bar as they ascend in rapid movement to travel horizontally. There is a slide seal located on the exterior of the bottom of the tray. The cutout prevents injury to the seal as it engages the bar. At the same time, the ramp compresses the slide seal and keeps the seal tight against the bar.

The seal surrounds an opening in the bottom of the tray and maintains an airtight contact at that point between the tray and the bar. Since a spring in the seal forces it downward towards the bar, the seal is resilient and readily adjusts itself to wobbling or any other motion of the tray, thus insuring a close contact in all postures. After coming

to a horizontal position on the bar, the tray continues to the left until it reaches a hole or opening in the upper surface of the bar. The tray here makes an intermittent stop and the seal on the tray immediately encircles the hole in the bar. At this point, in place and time, a strip of film has just been heated and extended over the tray. Immediately, a vacuum force—of some 10 pounds per inch—from the manifold attached to the side of the bar, is applied through the hole and thence into the tray. Its function is to draw the film down, so that it fits tightly against the interior surfaces of the tray. Thereafter the tray resumes its leftward passage.

When the tray proceeds, its bottom aperture is closed as the seal moves upon and against the surface of the bar, and the seal performs its vital purpose—to maintain the vacuum between the film and the tray. Otherwise, the entry of air through the bottom of the tray and under the film, would lift and destroy the packaging pocket formed by the film. As the tray goes on, no further heat is applied to the film, but the vacuum is replenished at subsequent stations by smaller suction holes in the bar.

After the last such booster vacuum and ending the particular operation involved in this suit, the tray passes to an automatic feeder. The frankfurters are there loaded into the tray and hold the film in place, so that no further vacuum is required. Another strip of film, spread along and upon the top of the tray by other means, is fused with the edges of the film already in the tray, hermetically sealing the package except for a small opening to allow later evacuation of the air from within the package. A machine so equipped has a productive capacity, it is said, of 60 pounds—600 frankfurters—per minute.

Appellant-plaintiff Mahaffy designates this machine as a 6–14F type. In addition to the 6–14F's made and delivered to Standard by Mahaffy in accordance with their agreement, Mahaffy has itself manufactured about 160, and Standard has had at least 50 made by

other suppliers. The defendant-appellee Standard concedes that the units it obtained from other suppliers for sale infringe the patent if it is valid.

The desideratum of the industry for years had been a package of 10 frankfurters—a weight of 1 pound—in an unwrinkled container. Plainly, a single package of 10 would be far more economical in the consumption of expensive film than two packages of 5 each. Previously, the machines could adquately handle only a shallow tray of about a one-inch depth—deep enough for only a 5-frankfurter package. A machine with a "deep" tray draft—approximately two inches—was demanded and tray draft of more than one inch had not yet been achieved.

The chief obstacle to the development of such a machine was that in a deep draft the film then in use would, after heating and before cooling in place, spring from the tray on passing beyond the vacuum point. The fundamental cause was that in moving from one station to another the tray lost vacuum. To avoid these difficulties, it was necessary to stop the machine until the film cooled upon contact with the aluminum of the tray. This interruption, of course, prevented rapid production. The 6–14F endeavored to remedy these deficiencies by maintaining the vacuum with the sliding seal between the tray and the bar, thereby holding the film in the tray as it moved along and replenishing the vacuum at close subsequent stages.

The prior art in vacuum packaging had consisted of at least three devices. There was the 6–12 machine, patented as 2,935,828 by Mahaffy et al., May 10, 1960, on an application dated April 16, 1957. Briefly, it operated by the vertical rotation of trays on a drum, fitting the trays overtop the object to be packaged, and thereafter sealing the package. A coaxial vacuum manifold, connected to the trays by plastic tubes, drew the film into the trays, and then held the vacuum with a slide seal device. Besides consuming excessive amounts of film, it could not package more than 5 frankfurters in a tray at one time. The reason was that its trays covered the food from above and two layers could not be held neatly in place ready for the tray to cover them. Hence the 6–12 was never seriously considered as a deep-draw frankfurter packaging machine.

Another machine was the Cloud patent, No. 3,126,681, applied for December 28, 1960 and issued March 31, 1964. It was a straight- or in-line tray machine, with a valve in the bottom of each tray that connected and disengaged with vacuuming ports in a horizontal manifold below the tray. Since it was not successful in its declared purpose to maintain vacuum between stages in the packaging process, the Cloud machine missed the mark of the industry.

Still another machine was the progeny of an agreement of January 23, 1959, wherein plaintiff Mahaffy was called on to design and build for defendant Standard a vacuum packing machine known as the 6–14 (plain) type. The machine is the subject of patent 3,061,984, issued November 6, 1962, on an application of September 25, 1959, and is the immediate predecessor of the patent in suit, 839. The 6–14 was not successful as a deep-draw machine. It was somewhat similar to the 839 but it applied a vacuum to the tray through suction cups on a horizontal manifold that moved vertically to meet the tray as it came on station. The difficulty was that when the cups withdrew, as the tray moved away, an opportunity was created for air to enter the bottom of the tray. Thus the vacuum was not retainable to the point of loading. Nine of these machines were ordered by Standard from Mahaffy. The first was delivered in September, 1959 and went to purchaser Peter Eckrich & Sons, Inc. Others were delivered in 1960.

The failures of 6–14 were the subject of a conference in June, 1960 between plaintiff Mahaffy and Eckrich. It was then proposed that a plate of nylon or some other material be put along the manifold and under the tray to hold the

vacuum as the tray moved along.[1] Hopefully, this would prevent the "spring up" of the film. This consultation led to a second agreement, dated September 28, 1960, the one already noted in our quote from the District Judge's opinion, whereby plaintiff Mahaffy was to design and construct a machine for Standard, following the general principles of the 6–14, but with the improvements discussed with Eckrich. This undertaking resulted in the application on May 3, 1962, and the issuance on March 24, 1964, of the patent in suit, 839. It embraced the sliding seal conception and the implementing members earlier described in the outline herein of its operation.

■ The District Court's judgment of patent invalidity was premised on the facts we have just narrated. The evidence readily permits these subsidiary findings, and they fully allow the District Judge's conclusion that the patent lacked invention by reason of the obviousness condemned in 35 U.S.C. § 103. They override, we too think, the prima facie validity accorded by the law's presumption, 35 U.S.C. § 282. None of the 17 disputed patent claims, 1–4 and 7–19, can survive.

To start with, the use of a slide seal to preserve the vacuum was not new to the art of vacuum packaging. One was used as early as 1956 in the 6–12 machine, which though a rotary-type clearly demonstrated the application of the slide seal to vacuum packaging.

The teachings of this aspect of the 6–12 were well known to the designers of the 6–14F. Not only were the two developed by the same basic organization but, as noted, the planning conference for the 6–14F adverted specifically to this part of the 6–12, and suggested its slide seal as adaptable to the 6–14F. As one of the parties to the June, 1960 meeting testified:

"And we discussed at that time why didn't this machine have a holding method similar to what we had on the 6–12 machine, namely, whereby you could hold the vacuum between the stations, why not put the nylon manifold underneath the dies * * * Mr. Mahaffy mentioned * * * that nylon could be put—or some material— underneath the dies which, with spring loading and some kind of resiliency, would maintain intimate contact as these dies moved along from one position to another. It worked out very well on the 6–12 machine."

Not surprisingly, after this conference, the 6–14F slide seal bears strong resemblance in its essential features to that of the 6–12. The principles are identical. In the latter a metal disc has ports through it connected by plastic tubes to the trays. As the disc rotates with the trays, a nylon-plate manifold connected to the vacuum source is pressed against the disc. When the disc slides under the manifold, the ports of the disc become aligned, one by one, with the connection to the vacuum source, and vacuum force is exerted into the trays. When the disc continues its rotation, the port earlier exposed to the vacuum pull is sealed by the nylon manifold held tightly against the disc by springs.

The parallel between this device and that on the 6–14F, here involved, is clear. As described earlier, the 6–14F slide seal consists of a metal slide bar connected with the vacuum source, with a seal attached to the bottom of each tray and pressed against the slide bar by springs. Thus the only difference between the two slide seals is that the springed unit on the 6–12 is connected to the vacuum source while on the 6–14F the springed unit is fastened to the vacuum receiver. Even this difference is an unimportant one, for the 839 patent (claim 12) declares that either of the slide seal units may be resiliently mounted.

Both the 6–14 and the Cloud machine demonstrate the application of vacuum force to the bottoms of trays carried on an endless chain in an "in-line" machine.

1. Suggested, in addition, was enlargement of the tray, slightly, to accommodate longer frankfurters and to receive a double layer of them.

Unlike a rotary machine, where the trays remained always equi-distant from the vacuum source, the in-line machines move the trays at varying distances from the source; this presented the problem of devising a practicable means of applying vacuum to the trays. In both the 6–14 and the Cloud machines, it was solved the same way—by locating a horizontal vacuum manifold underneath the upper reach of the endless chain and connecting it with the openings in the tray bottoms. The 6–14F, of course, took the same approach.

In essence the only difference between the 839 and its predecessors, Cloud and 6–14, was this: in the earlier two the manifold was separated from the track or member on which the trays travelled, while in 839 the manifold was moved up to and against the track or member. The result was that no conduits were necessary to carry the vacuum from the manifold to the trays. It was in the operation of these connections that leaks or other diminution of the vacuum had occurred. The 6–12 type of sliding seal was recognized as the remedy.

We are not required to decide, and we do not, that the 6–12, the Cloud or the 6–14 patent technically constituted anticipations of the 839 in the prior art. But we do hold that they rendered obvious the improvements claimed in 839 as invention. Because of those patents and Mahaffy's familiarity with them, we think with the District Judge that the positioning, arrangement and play of the vacuum members in 839 "would have been obvious * * * to a person having an ordinary skill in the art" of vacuum packaging as employed here. 35 U.S.C. § 103. In making this judgment we have endeavored to follow the guides of the prescript in Graham v. John Deere Company, 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966):

> "Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved."

Since statutory obviousness is a question of fact, Noe v. Smith, 300 F. 2d 430 (5 Cir. 1962); Willis v. Town, 182 F.2d 892, 894 (8 Cir. 1950), we could reverse the District Judge's finding here only if we were convinced that it was clearly erroneous. F.R.Civ.P. 52(a). While on the objective facts alone, we altogether agree with the District Judge, noteworthy is the expert testimony to the effect that the advancements claimed in 839 would be obvious to an artisan experienced in vacuum packaging. On the record, these witnesses were competent and were qualified to express an opinion. Although decision is not rested on their evidence, it is a further confirmation of the findings of the District Judge.

"Sub-tests" such as commercial success, needs previously unsolved and failure of others to provide the solution, considerations suggested in Graham v. John Deere Company, supra, 383 U.S. 1, 86 S.Ct. 684 (1966) as negating obviousness, have not been overlooked. They simply have been found of insufficient weight to overturn the obviousness made plain in the evidence. Further, because of the views we have expressed, no review of the District Court's conclusion of overclaiming is necessary.

Affirmed.