Richard S. JOHNSON, Plaintiff–
Appellant,

v.

Moises QUINONES, M.D.; Joseph Morris,
O.D., Defendants–Appellees.

No. 97–2392.

United States Court of Appeals,
Fourth Circuit.

Argued March 4, 1998.

Decided May 12, 1998.

**ARGUED:** Thomas E. Albro, Tremblay & Smith, Charlottesville, VI, for Appellant. Larry Benson Kirksey, Penn, Stuart & Eskridge, Bristol, VI; Leigh Thompson Hanes, Wooten & Hart, Roanoke, VI, for Appellees. **ON BRIEF:**Peter D. Vieth, Wooten & Hart, Roanoke, VI, for Appellees.

Before WILKINSON, Chief Judge, NIEMEYER, Circuit Judge, and CLARKE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Senior Judge Clarke wrote the opinion, in which Chief Judge Wilkinson and Judge Niemeyer joined.

## OPINION

CLARKE, Senior District Judge:

In this case, we must decide whether the district court properly entered summary judgment against former Virginia inmate Richard S. Johnson on his § 1983 claim against two prison doctors. Johnson claims that the two doctors were deliberately indifferent to his medical needs and therefore violated his Eighth Amendment right to be free from cruel and unusual punishment. Because Johnson produces no evidence that the doctors subjectively knew about his serious medical condition, we affirm.

### I.

#### A.

The following facts are recited in the light most favorable to Johnson. *See Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985) (stating that on summary judgment, "[t]he facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to plaintiff").

Johnson, a Virginia prison inmate, entered Keen Mountain Correctional Facility in July 1991. When he arrived at the facility, he was in excellent health, had no pending medical appointments and was not taking any prescribed medications.

Between April 1992 and September 1994, Johnson was examined on seventeen occasions by Moises E. Quinones, M.D., a doctor under contract with the correctional facility to provide medical care to inmates. During these examinations, Dr. Quinones investigated Johnson's complaints of physical ailments including: headaches, bags that had developed under his eyes, night sweats, decreased and blurred vision, knee pain, lower back pain, blood tinged stools, colds, urinary tract infections, a rash, a bug bite, moles, a knot on his breastbone, ear pain, neck pain, bronchitis, sinusitis, arm pain, dizziness, indigestion, tight shoes, and weight loss. Johnson also experienced and complained of acromegaly, the medical term for enlargement of his hands and feet. *See Stedman's Medical Dictionary* 17 (24th ed.1982). Dr. Quinones never found any major medical problems with Johnson, although he prescribed various medications to treat minor infections and for pain.

Concerning the bags that developed under Johnson's eyes, Dr. Quinones consulted with a dermatologist. The dermatologist stated that the condition described is consistent with a cosmetic condition called cutis laxa, or loose skin around the eyes. *See id.* at 348. To remedy the condition, plastic surgery is required to remove the excess skin. Dr. Quinones then referred Johnson for an examination by a consulting ophthalmologist. The ophthalmologist examined Johnson and confirmed the previous diagnosis of cutis laxa. The ophthalmologist found no medical problem with Johnson's eyes. Johnson applied for plastic surgery to remedy his cutis laxa, and the Department of Corrections denied his request because the condition was purely cosmetic.

Concerning Johnson's complaints of decreased and blurred vision, Dr. Quinones referred Johnson to the facility's optometrist, Joseph Morris, O.D. Dr. Morris examined Johnson a total of four times between November 1992 and October 1994. During the first two examinations in November 1992 and March 1994, Johnson complained of blurred

near vision. On each occasion, Dr. Morris examined Johnson's eyesight at 20/20 in each eye and prescribed reading glasses to remedy Johnson's complaints of blurred near vision. During an August 1994 appointment, Johnson complained of bags under his eyes, headaches behind his right eye, and blurred vision, both near and far. Dr. Morris measured Johnson's eyesight at 20/25 and again prescribed new glasses. Finally, during an October 1994 appointment, Johnson complained again about bags under his eyes and deterioration of his vision. Dr. Morris measured Johnson's eyesight at 20/200. Yet, none of the objective examinations performed on Johnson's eyes were consistent with Johnson's subjective responses indicating a visual acuity of 20/200. Dr. Morris therefore wrote in his notes that Johnson was a malingerer and did not prescribe new glasses.

Johnson was released from prison on November 21, 1994. On November 22, 1994, he lost sight in his left eye. The next day, he made an appointment at the University of Virginia's Health Sciences Center. The first available appointment was not until late January 1995. On January 4, 1995, Johnson lost sight in his right eye. An ophthalmologist at the University of Virginia then agreed to examine Johnson on an emergency basis. The ophthalmologist diagnosed Johnson's vision problems as stemming from a pituitary tumor. Although the tumor was removed through surgery, it had already compressed Johnson's optic nerve leaving him blind.

### B.

Johnson files this suit against Dr. Quinones and Dr. Morris under 42 U.S.C. § 1983 alleging that his Eighth Amendment rights have been violated as a result of the doctors' deliberate indifference to his serious medical needs. Johnson also raises state law negligence claims alleging that the doctors negligently failed to diagnose and treat his pituitary tumor.

In the district court, Johnson produced evidence in the form of medical expert affidavit and deposition testimony that headaches, night sweats, vision problems and cutis laxa are symptoms of a pituitary tumor. He also produced medical expert evidence that acromegaly is the hallmark symptom of a pituitary tumor. If you have acromegaly, Johnson's experts opine, you have a pituitary tumor.

To avoid summary judgment, Johnson attempted to prove that both Dr. Quinones and Dr. Morris were trained to recognize the symptoms of a pituitary tumor. Johnson was successful in getting Dr. Quinones to admit that he knew of the link between acromegaly and pituitary tumors. Johnson also produced evidence that Dr. Morris was trained in optometry school that acromegaly was a symptom of pituitary tumors. Thus, for purposes of summary judgment, we will assume that both doctors knew generally of the symptoms of pituitary tumors.

Entering summary judgment against Johnson, the district court correctly recognized that even if the doctors knew the symptoms of pituitary tumors and listened to Johnson's complaints of his symptoms, Johnson has failed to meet his burden of producing evidence creating a genuine issue of material fact concerning the doctors' deliberate indifference to serious medical needs. In other words, any negligence or malpractice on the part of the doctors in missing the diagnosis does not, by itself, support an inference of deliberate indifference by the doctors to Johnson's medical needs. To avoid summary judgment, Johnson needed to produce evidence that the doctors actually drew the inference between the symptoms and the tumor. Concerning the state law negligence claims, the district court declined to exercise supplemental jurisdiction and dismissed them without prejudice.

### II.

The standard of review in this case is familiar. We review the district court's grant of summary judgment *de novo. Stone v. Liberty Mut. Ins. Co.,* 105 F.3d 188, 191 (4th Cir.1997). Pursuant to Fed.R.Civ.P. 56(c), a district court must enter judgment against a party who, "after adequate time for discovery ... fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at

trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law," entry of summary judgment is mandated. Fed.R.Civ.P. 56(c); *see Stone,* 105 F.3d at 190. To avoid summary judgment on defendant's motion, a plaintiff must produce evidence creating a genuine issue of material fact. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material fact is in dispute, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson, Id.* at 255, 106 S.Ct. at 2513–14.

### A.

■ The Eighth Amendment expressly prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. "It not only outlaws excessive sentences but also protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin,* 77 F.3d 756, 761 (4th Cir.1996); *see Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2323–24, 115 L.Ed.2d 271 (1991) (noting that the Eighth Amendment protects against "deprivations" that are "suffered during imprisonment"); *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) (holding that "deliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment). To succeed on an Eighth Amendment "cruel and unusual punishment" claim, a prisoner must prove two elements: (1) that objectively the deprivation of a basic human need was "sufficiently serious," and (2) that subjectively the prison officials acted with a "sufficiently culpable state of mind." *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324; *see Rish v. Johnson,* 131 F.3d 1092, 1096 (4th Cir.1997); *Williams,* 77 F.3d at 761; *Strickler v. Waters,* 989 F.2d 1375, 1379 (4th Cir.), *cert. denied,* 510 U.S. 949, 114 S.Ct. 393, 126 L.Ed.2d 341 (1993).

■ With regard to inadequate medical attention, the objective component is satisfied by a serious medical condition. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992); *see Estelle,* 429 U.S. at 105, 97 S.Ct. at 291–92; *Shakka v. Smith,* 71 F.3d 162, 166 (4th Cir.1995).

■ The subjective component is satisfied by showing deliberate indifference by prison officials. *Wilson,* 501 U.S. at 303, 111 S.Ct. at 2326–27 (holding that claims alleging inadequate medical care are subject to the "deliberate indifference" standard outlined in *Estelle,* 429 U.S. at 105–06, 97 S.Ct. at 291–92). "[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994); *see Williams,* 77 F.3d at 761 (stating that "the subjective component requires proof of more than mere negligence but less than malice"). Basically, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *see Amos,* 126 F.3d at 610 (stating that "prison officials[must] know of and disregard an objectively serious condition, medical need, or risk of harm"). A prison official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Farmer,* 511 U.S. at 844, 114 S.Ct. at 1982; *see Rich v. Bruce,* 129 F.3d 336, 338 (4th Cir.1997) (holding that prison official was not deliberately indifferent because he did not actually draw the inference that the prisoner was exposed to a specific risk of harm).

### B.

■ Assessed in the most favorable light possible, Johnson presented the following

case to the district court on summary judgment. First, both doctors knew that acromegalia, headaches, night sweats, vision problems, and cutis laxa are all symptoms of a pituitary tumor. Second, Johnson complained to both doctors about these symptoms. Third, neither doctor diagnosed the pituitary tumor which later caused Johnson to go blind.

Without a doubt, a pituitary tumor is a serious medical condition that satisfies the objective prong of an Eighth Amendment *prima facie* case. Johnson's case fails, however, because he has produced no evidence proving the subjective (deliberate indifference) prong. He has produced no evidence that the doctors subjectively knew about the pituitary tumor and deliberately failed to treat it.

■ At most, Johnson's case demonstrates that the doctors were negligent in missing the diagnosis. A missed diagnosis, however, does not automatically translate into deliberate indifference. *See Estelle*, 429 U.S. at 106, 97 S.Ct. at 292 (commenting that physician negligence "in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment"). *Farmer*, and our cases interpreting *Farmer*, make clear that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate. *See Farmer*, 511 U.S. at 837, 114 S.Ct. at 1978–79 (stating that "the official must both be aware that a substantial risk of serious harm exists, and he must also draw the inference"); *Rich*, 129 F.3d at 340 (stating that "*Farmer* makes clear that the defendant official . . . must actually have drawn the inference"). In other words, in this case the doctors must have actually drawn the inference that Johnson's acromegalia and other symptoms signified the presence of a pituitary tumor. Johnson has produced no evidence that the doctors actually made the connection between the symptoms and the tumor. His evidence may support a claim for negligence, but not a claim under the Eighth Amendment. *See Farmer*, 511 U.S. at 838, 114 S.Ct. at 1979–80

(commenting that society may wish to assure compensation for acts of negligence and the "common law reflects such concerns when it imposes tort liability on a purely objective basis").

Johnson argues that his symptoms—especially acromegaly—so obviously pointed to a pituitary tumor that the doctors were deliberately indifferent in treating Johnson for his symptoms without diagnosing his pituitary tumor. With this argument, Johnson would have us address the question of how obvious a condition must be before a doctor is deliberately indifferent in not diagnosing it. This question, however, misses the mark. The correct question is whether the doctor subjectively "knows of" the serious medical condition itself, not the symptoms of the serious medical condition. *Id.* at 837, 114 S.Ct. at 1978 (stating that a person is only reckless, and thus deliberately indifferent, when he "disregards a risk of harm of which he is aware"). The prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* Thus, "consciousness of a risk" of serious harm is required. *Id.* at 839, 114 S.Ct. at 1980 (equating deliberate indifference and recklessness with "consciously disregard[ing] a substantial risk of serious harm"); *see Brice v. Virginia Beach Correctional Center*, 58 F.3d 101, 105 (4th Cir.1995) (stating that "[a]ctual knowledge or awareness on the part of the [official is] essential to proof of deliberate indifference").

Here, there is evidence that Drs. Quinones and Morris knew about the various symptoms Johnson exhibited and tried to treat them. Indeed, to alleviate Johnson's blurred vision, Dr. Morris prescribed new eyeglasses. Dr. Quinones prescribed pain medication for Johnson's headaches and referred him to two specialists for vision problems and cutis laxa. Nevertheless, there is no evidence in the record that either doctor knew about the pituitary tumor itself. Johnson fails to meet his burden of producing some evidence of the doctors' subjective knowledge of the pituitary tumor. Without evidence that the doctors "bridged the gap" between the symptoms

and the tumor itself, Johnson cannot survive summary judgment.

Johnson's own evidence cuts against the conclusion that the doctors were deliberately indifferent. In an effort to diagnose Johnson's cutis laxa and blurred vision, Dr. Quinones referred Johnson to a consulting ophthalmologist and Dr. Morris, the facility's optometrist. Significantly, after examining Johnson's eyes, neither of these doctors recognized that Johnson was suffering from a pituitary tumor. But to assume, as Johnson argues, that he exhibited hallmark symptoms of a pituitary tumor, all three doctors should have immediately diagnosed the condition. The alternative scenario, that all three intentionally conspired to cover-up the condition, is so highly improbable that Johnson does not even argue it.[1]

Furthermore, the efforts that Dr. Quinones made in consulting with a dermatologist and referring Johnson to both an optometrist and ophthalmologist confirm that Dr. Quinones did not draw the inference between Johnson's symptoms and the tumor. If he subjectively knew about the tumor but did not want to disclose or treat it, he would not have brought in consulting physicians to examine Johnson's symptoms. By bringing in the other doctors, he would have exposed the very problem he wanted to hide. In short, Dr. Quinones' actions are hardly consistent with someone who is deliberately indifferent to or "recklessly disregarding" a serious medical condition. *Farmer*, 511 U.S. at 836, 114 S.Ct. at 1978 (stating that deliberate indifference "is the equivalent of recklessly disregarding [the] risk").

Johnson also argues that Dr. Morris' diagnosis of Johnson as a malingerer is evidence that Dr. Morris was deliberately indifferent to his medical needs. But, when viewed in context, the malingerer diagnosis is more consistent with Dr. Morris' claims that he simply missed the diagnosis. Dr. Morris examined Johnson four times. During the first two examinations in November 1992 and March 1994, Dr. Morris measured Johnson's eyesight at 20/20. During an August 1994 examination, Dr. Morris measured Johnson's eyesight at 20/25. On each of these visits, Dr. Morris prescribed new eyeglasses for Johnson. Then, during an October 1994 appointment, Dr. Morris measured Johnson's eyesight at 20/200. Significantly, however, none of the objective examinations performed by Dr. Morris at this time were consistent with Johnson's subjective responses indicating a visual acuity of 20/200. Dr. Morris could have believed, therefore, that Johnson was faking his deterioration in vision. Since Dr. Morris did not link Johnson's symptoms with the presence of a pituitary tumor, he believed Johnson was a malingerer for complaining about nonexistent eye problems.[2] Accordingly, Dr. Morris' malingerer diagnosis is not convincing evidence of deliberate indifference and does not create a genuine issue of material fact to avoid summary judgment in this case.[3]

### C.

Because Johnson has not produced evidence that Drs. Quinones and Morris subjectively knew about his pituitary tumor and failed to treat it, he has failed to raise a genuine issue of material fact warranting a

---

1. Both Dr. Quinones and Dr. Morris admit that they conferred about Johnson's complaints of vision problems. The mere fact that they conferred, however, falls short of suggesting a conspiracy to mis-diagnose. It is more consistent with an effort to collectively diagnose an objective medical condition based on their patient's subjective complaints.

2. Nor is it apparent that Dr. Morris, an optometrist, should have been expected to diagnose Johnson's pituitary tumor. While Johnson claims that Dr. Morris learned about the symptoms of pituitary tumors in optometry school, such a medical diagnosis generally falls outside Dr. Morris' field of expertise. *Compare Sted-*

*man's Medical Dictionary* 991 (defining "optometry" as a profession dealing with "vision problems and eye disorders") *with id.* at 988 (defining "ophthalmology" as a "medical speciality concerned with the eye, its diseases, and refractive errors"). Indeed, Dr. Morris states in an affidavit that he was not trained specifically to diagnose the condition and had never suspected or diagnosed it in a patient.

3. Dr. Morris also suspected that Johnson was faking his vision symptoms to convince the Department of Corrections to approve plastic surgery to remedy his cutis laxa. This fact alone would support the malingerer diagnosis.

trial on his deliberate indifference claim. Accordingly, we affirm the district court's entry of summary judgment against Johnson.[4]

*AFFIRMED*

**4.** Johnson does not challenge the district court's non-prejudicial dismissal of his state law claims. Nevertheless, we hold that the district court did not abuse its discretion in declining to exercise supplemental jurisdiction over those claims after it dismissed the federal § 1983 claim. *See Jordahl v. Democratic Party of Virginia,* 122 F.3d 192, 197 (4th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 856, 139 L.Ed.2d 756 (1998).