**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 23-6890**

---

MANUEL MORENO,

Plaintiff − Appellant,

v.

DR. CAROL C. BOSHOLM,

Defendant – Appellee,

and

JAPETH BETT; JOSE CRUZ; JEREMY EDWARDS; TIFFANY LOCKLEAR; MICHAEL MORSE,

Defendants.

---

**No. 23-6950**

---

MANUEL MORENO,

Plaintiff − Appellee,

v.

DR. CAROL C. BOSHOLM,

Defendant – Appellant,

and

JAPETH BETT; JOSE CRUZ; JEREMY EDWARDS; TIFFANY LOCKLEAR; MICHAEL MORSE,

                Defendants.

------

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro. Loretta C. Biggs, District Judge; L. Patrick Auld, Magistrate Judge. (1:19−cv−00360−LCB–LPA)

------

Argued: November 1, 2024, and May 23, 2025          Decided: August 15, 2025

------

Before DIAZ, Chief Judge, and AGEE and BENJAMIN, Circuit Judges.

------

Affirmed by published opinion. Judge Agee wrote the opinion, in which Chief Judge Diaz and Judge Benjamin join.

------

**ARGUED:** James Weldon Whalen, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, L.L.P., Raleigh, North Carolina, for Appellant/Cross-Appellee. Maria Papoulias Wood, HALL BOOTH SMITH, P.C., Raleigh, North Carolina, for Appellee/Cross-Appellant. **ON BRIEF:** Sam J. Ervin, IV, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, L.L.P., Raleigh, North Carolina, for Appellant/Cross-Appellee. Laura Gregory Brook, HALL BOOTH SMITH, P.C., Raleigh, North Carolina, for Appellee/Cross-Appellant.

------

2

AGEE, Circuit Judge:

After suffering severe complications from contracting influenza H1N1, Manuel Moreno filed a lawsuit against two dozen medical providers and other individuals working at the North Carolina prison where he was incarcerated at the time he fell ill. The claims against all but one of those defendants have been resolved and are not part of this appeal. Before us are state medical malpractice and gross negligence claims and a federal deliberate indifference claim that Moreno brought against Dr. Carol Bosholm, the medical provider who treated Moreno when he first presented symptoms to the prison's medical facility. At the close of trial, the district court granted Dr. Bosholm's renewed motion for judgment as a matter of law, from which Moreno appeals. As part of that appeal, Moreno also challenges a pre-trial ruling excluding evidence from his expert witness as to the appropriate standard of care and causation relating to the medical malpractice claim. Dr. Bosholm filed a cross appeal challenging numerous pre-trial rulings that she claims should have been decided differently and resulted in judgment in her favor before even reaching trial. For the reasons set forth below, we affirm.

I.

A.

Late in the afternoon on Friday, February 26, 2016, Moreno reported to the medical facility at Scotland Correctional Institute (SCI), a state prison where he was incarcerated.[1] He complained that "he had been sick for three to five days," J.A. 367, with symptoms that included a "sore throat, body aches, sinus pain and pressure, and coughing up green sputum," J.A. 465. Heather Sullivan, a nurse, examined Moreno and recorded his symptoms and that he had registered a respiration rate of 22, which is slightly elevated from a normal range of below 20. Moreno's oxygen saturation level was reported to be stable and within normal range, he did not have a temperature, and his vital signs otherwise "looked good." J.A. 445.

Dr. Bosholm was the physician on duty at the time. She did not personally examine Moreno, but after reviewing Nurse Sullivan's notes, she assessed that Moreno had sinus congestion and acute pharyngitis (sore throat), and prescribed amoxicillin.

The same afternoon that Moreno reported to the medical facility with symptoms, around thirty-five inmates from the same pod also reported in with cold and flu symptoms. Several inmates tested positive for the flu (Moreno was not tested for it). In an effort to prevent a wider outbreak, Dr. Bosholm ordered that Moreno and eighteen other inmates be kept in quarantine for seventy-two hours, which meant that they were confined to

---

[1] We recite the facts in the light most favorable to Moreno, the party opposing judgment as a matter of law. *Lavis v. Reverse Mortg. Sols., Inc.*, 40 F.4th 181, 186 n.2 (4th Cir. 2022).

dormitory style living spaces and not allowed into spaces within the general population such as the cafeteria and other common areas.

The substance of Moreno's claims centered on Dr. Bosholm's instructions for monitoring over the weekend. Before leaving work on Friday, she communicated the quarantine instructions to the nurses and nurse supervisor, providing "guidance . . . on what was expected over the weekend with each of those patients while they were on quarantine." J.A. 427–28. In sum, although Dr. Bosholm left general instructions for the quarantined inmates to be "monitor[ed]" over the weekend out of "concern[] that they might have an infectious disease like influenza," she did not specifically order anyone to watch Moreno's oxygen saturation or respiratory rates. J.A. 451.

It's undisputed that Dr. Bosholm, a contractor with SCI, was employed to work at the medical facility only on weekdays. On weekends, she did not report to work and was not otherwise required to be on call or to remotely monitor inmates. Nor was she notified about Moreno or other inmates' conditions when she was off duty.

Instead, throughout the weekend, SCI medical staff made routine rounds in the quarantined areas and inmates could also relay messages to them through correctional officers when they had any additional medical complaints. Rounds included vital sign assessments, but apart from one inmate (not Moreno) reporting a headache, nothing out of the ordinary was reported from the quarantined inmates over the weekend.[2] Nothing in the

---

[2] Although the contemporaneous record reflects "[v]ital signs assessments" occurred daily, the only recorded assessment relates to temperatures. J.A. 361. There's no (Continued)

5

record suggests that Moreno reported any concerns to staff concerning his condition over the weekend.

By Monday afternoon, Moreno's condition had sharply deteriorated. He complained of a headache and vomiting. The nurse observed that Moreno's nail beds and lips had a blue tint, which indicated low oxygen levels in the blood stream. His oxygen levels fell to 85 percent on room air, so a nurse gave Moreno a nasal cannula that led his oxygen level to rise to 92 percent. At that point, Dr. Bosholm was called to examine Moreno and, after doing so, she ordered that Moreno be transferred to a local hospital.

Shortly after he arrived at the hospital, Moreno suffered a generalized grand mal seizure that led to him being in a coma for over a month. In the time following his transfer, Moreno was tested and confirmed positive for influenza H1N1 (swine flu) and also diagnosed with "severe sepsis" and MSSA pneumonia ("a bacterial superinfection"). J.A. 473. Although he survived this ordeal, Moreno suffered a host of complications including memory loss; permanent injury to the kidneys, liver, and eyes; and loss of mobility requiring use of a wheelchair. In addition to bearing these physical marks, Moreno testified to the emotional and mental toll of this experience.

---

indication in the record that Moreno's oxygen saturation or respiration rates were recorded over the weekend, and we assume that they were not measured.

B.

1.

In 2019, Moreno filed a complaint in the U.S. District Court for the Middle District of North Carolina alleging state and federal claims against two-dozen defendants for their alleged roles in the medical complications he suffered at SCI. Relevant to this appeal, he alleged that Dr. Bosholm was liable under state law for negligence and gross negligence and under 42 U.S.C. § 1983 for violating his constitutional rights by being deliberately indifferent to and recklessly disregarding his serious medical condition.[3]

Those claims survived Dr. Bosholm's motions to dismiss and for summary judgment, clearing the way for them to proceed to trial. First, however, the district court considered Dr. Bosholm's omnibus motion *in limine*. Relevant here, Dr. Bosholm moved to exclude medical testimony from Moreno's expert witness, Dr. Robert Bilbro, "regarding the standard of care applicable to [Dr. Bosholm] because he does not qualify as an expert under [North Carolina] Rule [of Evidence] 702(b)." J.A. 207.

---

[3] Under North Carolina law, a "negligence" claim arising from "the furnishing or failure to furnish professional services in the performance of medical . . . or other health care by a health care provider" is redesignated a "[m]edical malpractice action" regardless of how the plaintiff labels his claim. N.C. Gen. Stat. § 90.21.11(2)(a); *see also Stevenson v. N.C. Dep't of Corr.*, 714 S.E.2d 435, 437 (N.C. Ct. App. 2011).

On appeal, Moreno does not challenge that his negligence action is appropriately characterized as a medical malpractice action under the North Carolina statute, nor could he under the above definition. Instead, he argues that federal, not state, rules should be used to determine the admissibility of evidence relating to those medical malpractice claims when it is brought in federal court. That's a different question than the threshold recharacterization of them as North Carolina medical malpractice actions. For consistency, but with this understanding in mind, we will refer to Moreno's ordinary negligence claim as his medical malpractice claim throughout this opinion.

7

The district court granted Dr. Bosholm's motion *in limine* "to the extent that Dr. Bilbro seeks to testify as to the standard of care relevant to any medical malpractice claim under North Carolina law" and it reserved ruling with respect to other medical testimony Dr. Bilbro may provide. J.A. 226. In so ruling, the district court characterized the parties' dispute as follows: Dr. Bosholm maintained that Dr. Bilbro could not testify "regarding the standard of care applicable to" her because he "does not qualify as an expert witness under North Carolina Rule of Evidence Rule 702(b)." J.A. 223.[4] For his part, Moreno argued that "this motion is irrelevant" to his deliberate indifference claim and to an ordinary negligence claim because "standard-of-care expert [testimony] is unnecessary" to them. J.A. 223. In addition, Moreno "argue[d] that the rules applicable to standard-of-care experts under North Carolina Rule of Evidence 702 do not apply in this federal case." J.A. 223. The district court characterized Moreno's negligence claim as one subject to the expert-witness requirements of a medical malpractice claim, agreed with other district courts that North Carolina Rule of Evidence 702(b) is a "substantive element of" such a claim," J.A. 224 (internal quotations omitted), and found that Dr. Bilbro did not meet the Rule's active clinical practice or instructional requirements. Based on these determinations, it ruled that "Dr. Bilbro [wa]s not qualified to offer standard of care testimony under" Rule 702(b). J.A.

---

[4] North Carolina Rule of Evidence 702(b) states in relevant part that "a person shall not give expert testimony" on the applicable standard of care in a medical malpractice action unless the expert witness has, among other things, spent "a majority of [their] professional time" "[d]uring the year immediately preceding the date of the occurrence that is the basis for the action" being engaged in the "active clinical practice of the same health profession" or teaching students.

8

225. Accordingly, it "exclude[d] Dr. Bilbro from testifying about the standard of care applicable to Dr. Bosholm," while observing that since Dr. Bosholm did not allege the testimony should be excluded on any basis apart from Rule 702(b), Dr. Bilbro "may still testify as to other aspects of [Moreno's] claims." J.A. 226.

Moreno moved for the district court to reconsider this decision. In ruling from the bench, the district court restated its view that N.C. Rule 702(b) governed whether Dr. Bilbro could testify on the standard of care applicable to a North Carolina medical malpractice claim, but that he did not satisfy the rule's active clinical practice or instructional requirements. In addition, the court cited another part of N.C. Rule 702 that it had not previously relied on—that Dr. Bilbro's deposition testimony indicated that he had not reviewed Dr. Bosholm's training and practice before forming his opinion.

The record contains a proffer as to what Dr. Bilbro's testimony would have been as to the standard of care. When asked how Dr. Bosholm "breached the standard of care on [Friday,] February 26, 2016, when treating" Moreno, Dr. Bilbro responded, "my grievance is not with what was done on the 26th, but with a lack of follow-up instruction, protocol, what have you, such that the staff would recognize he was short of breath and should have had his oxygen level measured." J.A. 318.[5]

---

[5] The district court record contains copies of Dr. Bilbro's deposition testimony and expert report. Dep. of Robert H. Bilbro, MD, *Moreno v. Ahmed*, No. 1:19-cv-360 (M.D.N.C. Mar. 31, 2023), ECF No. 120-2; Expert Report of Dr. Robert Hodges Bilbro, *Moreno v. Ahmed*, No. 1:19-cv-360 (M.D.N.C. Mar. 31, 2023), ECF No. 120-28, Ex. A. Both confirm his consistent view that Moreno's oxygen saturation levels and respiration rates should have been monitored over the weekend and that such testing would have made his worsening condition apparent before it reached critical levels Monday afternoon. Read (Continued)

9

2.

The case proceeded to trial on Moreno's claims that Dr. Bosholm committed medical malpractice and was both grossly negligent and deliberately indifferent to his medical condition because of her failure to provide adequate instructions for monitoring Moreno's condition over the weekend.[6] At trial, numerous individuals—including both parties—testified as to the events at issue and described above.

In addition, Moreno's expert in internal medicine, Dr. Bilbro, testified, consistent with the pre-trial ruling limiting the scope of his opinions. Having reviewed Moreno's medical records, Dr. Bilbro expressed his opinion that "Moreno almost died as a result of his care or limited care February 26 to 29, 2016," and that the seizure, coma, and vital organ damage "were all preventable." J.A. 275. He identified Moreno's Friday afternoon respiratory rate of twenty-two to be "abnormally rapid," suggesting "some deficiency in

---

in the light most favorable to Moreno, Dr. Bilbro faulted Dr. Bosholm for her failure to instruct the individuals who were on duty over the weekend to perform those checks. *E.g.*, Dep. of Robert H. Bilbro, MD, ECF No. 120-2, at 32:21–33:4 (questioning whether Dr. Bosholm had failed to "leave some directives as to what [SCI medical staff who were on duty] should do to observe . . . these 19 guys in quarantine" and whether they were told to "assess . . . respirations[,] pulse rate[,] and . . . blood pressure?").

[6] The record reflects that Moreno's theory of liability shifted throughout the litigation and even at trial. At times, he emphasized Dr. Bosholm's failure to administer a flu test and prescribe Tamiflu on Friday afternoon and her decision to quarantine him with individuals known to have the flu. On appeal, however, he has not pressed that position. Instead, and as confirmed during oral argument, he has narrowed the basis for his asserted state and federal claim to Dr. Bosholm's failure to instruct the weekend staff and provide an adequate protocol for monitoring Moreno over the weekend. In his view, Dr. Bosholm's liability arises from her failure to specifically instruct the weekend medical staff to monitor Moreno's oxygen saturation levels and respiration rates. Had such instructions been provided, Moreno contends that his deteriorating condition would have been identified earlier resulting in earlier intervention and fewer complications.

10

his lung function" that would warrant specific monitoring of Moreno's lungs going forward. J.A. 290. In his view, there should have been some "training of the staff, or a protocol that was provided, or by instruction, or physician orders," someone at SCI should have "recognized that Mr. Moreno [was] short of breath," which "should have triggered measuring his pulse ox." J.A. 288. And, after recounting what the records showed as to Moreno's low oxygenation levels on Monday, Dr. Bilbro opined that Moreno's "oxygen level was low" over the weekend and was "sure it declined progressively. It didn't happen all of a sudden." J.A. 287. In short, Dr. Bilbro testified that, in his opinion, if Moreno's oxygen levels had been monitored over the weekend, intervention could have occurred earlier—before reaching dangerously low levels and thereby preventing the events that followed. And Dr. Bilbro placed responsibility for Moreno's weekend monitoring with Dr. Bosholm because she was the only physician identified in the paperwork and had issued the instructions regarding weekend monitoring on Friday afternoon.[7]

At the close of the evidence, Dr. Bosholm renewed her motion for judgment as a matter of law, arguing that the trial record did not contain sufficient evidence for the jury

---

[7] As this recitation summarizes, Dr. Bilbro was permitted to testify extensively about what the medical records showed regarding Moreno's treatment (or lack thereof) on February 26 through 29, including his opinion that Moreno's oxygen levels and respiration rates should have been monitored and that Dr. Bosholm was responsible for giving such instructions. But the district court sustained objections to questions specifically asking Dr. Bilbro "what would have prevented" the physical injuries he sustained after February 29, if there were "any additional steps that, in your opinion, should have been taken when treating . . . Moreno," "who was responsible for the medical care that [he] received on February 26th," and "were [Moreno's injuries] caused by the events of February 26th, 2016, and February 29th, 2016?" J.A. 297–98.

11

to find her liable on the remaining state or federal claims. The district court granted the motion as to all claims.

In so ruling, the district court observed that each claim had a mandatory causation element and the court concluded that Moreno had failed to come forward with sufficient evidence to establish that element. It cited an absence of evidence that Moreno "would not have been injured without Dr. Bosholm's conduct," that his "injuries were worsened by Dr. Bosholm's conduct, or that [they] were reasonably foreseeable as a result of [her] conduct." J.A. 521; *accord* J.A. 524 (discussing that it was the absence of *any* "testimony at all to support a causation element," not an issue of witness credibility that led to the court's ruling); J.A. 528 (addressing medical malpractice).

In addition to its conclusion that Moreno had not shown causation, the district court also articulated claim-specific grounds for granting Dr. Bosholm's motion. As for the medical malpractice claim, the district court concluded that Moreno had not presented evidence that would permit a jury to find for him on the additional elements of the applicable standard of care or breach of that standard of care. As for establishing the standard of care, the court observed that its pre-trial ruling excluded Dr. Bilbro's expected testimony on this point and that Moreno had not introduced alternative expert testimony. It rejected Moreno's argument that he did not need to follow the usual route of presenting such evidence through expert testimony because the exception allowing reliance on the doctrine of *res ipsa loquitur* applied. The court then found that as a consequence of not presenting any admissible evidence establishing the standard of care, Moreno had necessarily failed to present evidence that Dr. Bosholm's conduct breached that standard.

12

With respect to the gross negligence and deliberate indifference claims, the court found no evidence that Dr. Bosholm engaged in conduct that would establish her acts or omissions rose to the heightened level required for such claims. It first noted the analytical parallels between the proof required to show gross negligence—that she "engaged in willful or wanton conduct," J.A. 522—and deliberate indifference—that she acted with "conscious or reckless disregard of the consequences of one's acts or omissions," J.A. 519. The court observed that Dr. Bosholm diagnosed and provided medical treatment to Moreno based on his symptoms on Friday, and that she "immediately sent him to the hospital after seeing the symptoms that he presented on" Monday. J.A. 520. The court also observed that no testimony from Dr. Bilbro or other evidence supported the conclusion that "Dr. Bosholm was so grossly incompetent that any reasonable jury could find that it rose to" the requisite level of gross negligence or deliberate indifference. J.A. 520–21; *see also* J.A. 523.

Last, with respect to the deliberate indifference claim, the court also concluded that Moreno "failed to present sufficient evidence from which a jury could find . . . that Dr. Bosholm actually knew of Mr. Moreno's serious medical need that required attention." J.A. 519. It again relied on the fact that Dr. Bosholm acted each time she was presented with information about Moreno's condition and that there was no evidence that she knew anything about his condition during the weekend, let alone that she failed to act despite

13

actual knowledge that his condition was worsening (assuming anyone at SCI knew that it was worsening).[8]

Based on its bench ruling, the district court entered judgment in favor of Dr. Bosholm.

## C.

Moreno noted a timely appeal, as did Dr. Bosholm by cross appeal, and we consolidated the appeals for purposes of briefing and argument.

We have jurisdiction under 28 U.S.C. § 1291.

Several weeks before our scheduled oral argument in this appeal, Dr. Bosholm moved to dismiss the appeal or disqualify opposing counsel based on his serving as a law clerk for the district court judge assigned to this case during its pendency in the Middle District of North Carolina. We denied that motion before argument without elaborating as to the basis for our decision, but later in this opinion will address it. *See infra* Section II.C.

Second, after oral argument, we ordered supplemental briefing on a question that arose as part of considering Moreno's challenge to the district court's exclusion of Dr. Bilbro's testimony as to the standard of care. Thereafter, we conducted a second argument limited to that issue.

---

[8] The district court also granted judgment as a matter of law on the issue of punitive damages, concluding that Moreno had not presented any evidence at trial to permit a finding that "Dr. Bosholm's conduct was malicious or in reckless disregard of [Moreno's] rights." J.A. 524. Moreno did not address this ruling anywhere in his opening brief, so he has waived appellate review of that decision and it is not before us. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief[.]").

14

* * * *

Having summarized the background facts and procedural history of this case, we now turn to our discussion of the issues before us on appeal.

## II.

In his opening brief, Moreno raised two issues. First, he asserted the district court erred "by applying state evidentiary rules to limit the testimony of Mr. Moreno's expert witness when federal rules of evidence, not state rules, apply in federal court." Opening Br. 3. Second, he asserted the district court erred in granting Dr. Bosholm's motion for judgment as a matter of law because the trial record contained sufficient evidence to support Moreno's claims for gross negligence and deliberate indifference.

In her cross-appeal, Dr. Bosholm raises multiple arguments to support her view that Moreno's claims should have been dismissed or decided by summary judgment before trial.

We address below only those arguments that are necessary to decide each claim.

### A. Medical Malpractice

To be liable for medical malpractice under North Carolina law, "the trier of fact [must] find[] by the greater weight of the evidence that the care of such health care provider was not in accordance with the standards of practice among members of the same health care profession with similar training and experience." N.C. Gen. Stat. § 90-21.12(a). Thus, to prove a medical malpractice claim, a plaintiff must establish: "(1) the standard of care[, i.e., the duty owed]; (2) breach of the standard of care; (3) proximate causation; and (4) damages." *Atkins v. Mortenson*, 644 S.E.2d 625, 630 (N.C. Ct. App. 2007) (cleaned up).

15

"Because the standard of care in a medical malpractice action generally involves specialized knowledge, expert testimony is necessary to establish the applicable standard of care and any corresponding breach." *Id.* (citations omitted).[9]

Given North Carolina's policy interest in regulating who is qualified to provide testimony going to the standard of care and its breach in a medical malpractice action, the State has adopted an evidentiary rule governing who can testify as an expert on these elements of the claim. *Gray v. E. Carolina Med. Servs., PLLC*, 876 S.E.2d 670, 674–75 (N.C. Ct. App. 2022) ("[N.C.] Rule 702(b) . . . provides that a person shall not give expert testimony on the appropriate standard of care in a medical malpractice action unless the person [meets its criteria]."). In relevant part, North Carolina Rule of Evidence 702(b) provides:

> In a medical malpractice action as defined in [N.C. Gen. Stat. §] 90-21.11, a person shall not give expert testimony on the appropriate standard of health care as defined in [Gen. Stat. §] 90-21.12 unless the person is a licensed health care provider in this State or another state and meets the following criteria:
>
> (1) . . .
>
> (2) During the year immediately preceding the date of the occurrence that is the basis for the action, the expert witness must have devoted a majority of his or her professional time to either or both of the following:
>
> > a. The active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered . . .; or

---

[9] As noted, an exception exists when a plaintiff can proceed on a *res ipsa loquitur* theory, but the district court deemed that inapplicable in this case, and Moreno has not challenged that determination on appeal.

16

          b.   The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered . . . .

N.C. R. Evid. 702(b).

Relying on this rule, the district court excluded Dr. Bilbro's testimony about the standard of care and its breach applicable to Moreno's medical malpractice claim.

Moreno challenges the decision, and we review the district court's decision for abuse of discretion. *Wickersham v. Ford Motor Co.*, 997 F.3d 526, 531 (4th Cir. 2021). One way that a district court can abuse its discretion is when its conclusion is "guided by erroneous legal principles." *In re Jemsek Clinic P.A.*, 850 F.3d 150, 156 (4th Cir. 2017) (internal quotations omitted).

### 1.

Moreno contends the district court abused its discretion by committing legal error when relying on North Carolina Rule of Evidence 702(b) to determine the admissibility of Dr. Bilbro's testimony given that federal, not state, evidentiary rules apply when federal courts consider state claims. He points to Federal Rule of Evidence 702, which provides criteria for the admissibility of "testimony by expert witnesses" in federal court as the controlling law that should have been used to determine whether to admit Dr. Bilbro's testimony. And because FRE 702 does not have an active clinical practice or instruction component that experts must satisfy before their testimony can be admitted, Moreno contends that Dr. Bilbro's testimony should have been admitted.

17

Before responding to this argument, we first discuss an aspect of this case that led us to order supplemental briefing and hold a second argument. In originally presenting the above issue and argument, both the district court and the parties characterized the relevant question in terms of a match-up between the applicability of FRE 702 or North Carolina Rule of Evidence 702(b). To that end, they cited various cases discussing the *Erie*[10] Doctrine and more recent Supreme Court cases clarifying its operation such as *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010).

We engaged the issue as it was presented to us, but after oral argument the application of Federal Rule of Evidence 601 on this issue came to light. That rule states: "Every person is competent to be a witness unless these rules provide otherwise. *But in a civil case, state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision*." Fed. R. Evid. 601 (emphasis added). Every circuit court of appeals to have considered this issue has relied on the second sentence of FRE 601 to apply state rules governing who can provide expert witness testimony about the standard of care applicable in a state medical malpractice action when such claims are brought in federal court. *See Coleman v. United States*, 912 F.3d 824, 829–34 (5th Cir. 2019); *Liebsack v. United States*, 731 F.3d 850, 855–57 (9th Cir. 2013); *McDowell v. Brown*, 392 F.3d 1283, 1294–97 (11th Cir. 2004); *Legg v. Chopra*, 286 F.3d 286, 289–92 (6th Cir. 2002).

---

[10] *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

18

Given this body of law, we ordered supplemental briefing and, later, a second oral argument. The parties engaged this issue as requested, but Moreno also argued that the question of FRE 601's potential applicability to the question he raised on appeal was not properly before the Court because Dr. Bosholm had not pressed it either in district court or in her initial appellate briefing.[11] We first consider this forfeiture argument before then turning to the substance of the issue Moreno has raised.

2.

Moreno asserts that we should not consider whether FRE 601 answers the evidentiary question he raises on appeal because—until we posed the matter—Dr. Bosholm did not rely on it as a basis for arguing that North Carolina Rule of Evidence 702(b) required exclusion of Dr. Bilbro's testimony. We do not take this argument or the Court's forfeiture rules lightly. Nonetheless, those rules permit us to consider FRE 601's potential applicability to the issue Moreno has presented on appeal.

To be sure, our general rule states that "[e]ven appellees" can forfeit "arguments by failing to brief them." *Stokes*, 64 F.4th at 137 (quotation marks and citation omitted). This

---

[11] While Moreno argues in terms of waiver, we believe the argument is better expressed as one of forfeiture. Admittedly, our cases often use the terms interchangeably thereby muddling their distinct meanings. That said, generally speaking, "'waiver' refers to a knowing, and intelligent decision to abandon an issue," while "'[f]orfeiture' refers to a party's inadvertent failure to raise an argument." *Stokes v. Stirling*, 64 F.4th 131, 136 n.3 (4th Cir. 2023). Having not raised a FRE 601 argument before we ordered her to do so, Dr. Bosholm's conduct here is better understood as an inadvertent failure to raise an argument rather than intentional relinquishment of the issue.

concept reflects Federal Rule of Appellate Procedure 28(a) and (b)'s instructions that parties are to brief their arguments in their initial briefs filed in every appeal. *Cf. id.*

But the expression of the *general* rule is just that: a rule that has embedded exceptions allowing the Court to excuse a party's forfeiture "in very limited circumstances." *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993). One such circumstance lies at the heart of our charge as jurists "to decide cases correctly, even if that means considering arguments raised for the first time on appeal (or not raised by the parties at all)." *Meyers v. Lamer*, 743 F.3d 908, 912 (4th Cir. 2014); *see also Roberts v. Carter-Young, Inc.*, 131 F.4th 241, 249 n.2 (4th Cir. 2025) ("It is our duty to interpret the law, and party presentation principles do not override that ultimate duty.").[12] Put differently, it is our job to get things right. Sometimes—as here—that will involve grappling with relevant law that the parties and the district court themselves failed to consider.

The connection of Moreno's question presented on appeal with FRE 601 makes it appropriate for us to look past Dr. Bosholm's earlier failure to rely on that rule as a basis

---

[12] Relatedly, potential forfeiture by an appellee has always been treated somewhat more leniently than in the case of appellant, in part because of the competing principle that we can affirm the district court "on any ground apparent on the record" *Moore v. Frazier*, 941 F.3d 717, 725 (4th Cir. 2019); *see Stokes*, 64 F.3d at 146–47 (Quattlebaum, J., dissenting) (discussing the interplay between these rules in this and other circuits, and noting that as the prevailing party below, "the appellee only seeks to maintain the status quo" and thus does not have the "burden to show that the judgment below should be altered," and thus is generally allowed to "rely upon any matter appearing in the record in support of the judgment below"). Under this principle, which some jurisdictions label the "tipsy coachman" rule, we do not limit appellees to the district court's reasoning when urging affirmance, nor are we so bound when reviewing that judgment. *Stokes*, 64 F.3d at 147 n.3 (Quattlebaum, J., dissenting),

for excluding Dr. Bilbro's testimony. Moreno—not Dr. Bosholm—appealed the issue of whether the district court abused its discretion in excluding Dr. Bilbro's standard-of-care testimony on the basis of North Carolina Rule of Evidence 702(b). And he articulated the legal question broadly: "Did the District Court err by applying state evidentiary rules to limit the testimony of Mr. Moreno's expert witness when federal rules of evidence, not state rules, apply in federal court?" Opening Br. 3. FRE 601 directly addresses when a federal court must invoke state rules of decision relating to witness competency. Put differently, it tells federal courts to apply certain state rules when determining if a witness can testify on particular matters. So, at least arguably—and as our sister circuits have held—it bears on the question of whether the district court erred in applying a state, rather than federal, rule regarding who can offer expert testimony about the standard of care applicable in a state medical malpractice claim brought in federal court. But Moreno now asks us, on the basis of forfeiture principles, to turn a blind eye to the full body of law that may be relevant to the precise issue he has brought before us while still asking us to answer that question. That would be an odd position from which to base our analysis on the merits given our core duty "to decide cases correctly." *Meyers*, 743 F.3d at 912.

While this exception to the general forfeiture rule is sufficient basis to excuse Dr. Bosholm's earlier omissions, we make one further observation for why it's appropriate to do so here even though it is not itself an exception to the general forfeiture rule. The pragmatic grounds that we often cite as a basis for enforcing our general forfeiture rule do not counsel in favor of its enforcement in this case. Namely, we often cite concerns about fairness to the parties and the desire to avoid making decisions without the benefit of full

21

briefing as reasons why we will enforce the generally applicable forfeiture principle. *E.g.*, *Stokes*, 64 F.4th at 137 ("Enforcing waiver and forfeiture rules against appellees reflects the principle that we apply these rules on a consistent basis so that they provide a substantial measure of fairness and certainty to the litigants who appear before us." (cleaned up)); *Hunt v. Nuth*, 57 F.3d 1327, 1338 (4th Cir. 1995) (observing that the Court's disinclination to consider new arguments not raised in an initial brief stems from it being "unfair to the appellee and would risk an improvident or ill-advised opinion on the legal issues"). But in this case, these concerns do not exist given that we provided both parties the opportunity to address FRE 601's potential applicability in supplemental briefing and a second oral argument.

Accordingly, Dr. Bosholm's failure to previously rely on FRE 601 as a basis for excluding Dr. Bilbro's standard-of-care testimony is not a ground upon which to sidestep the merits of this issue.

3.

a.

There are many ways to articulate Moreno's question presented, but each formulation asks us to consider the intersection of federal and state rules about witness testimony. Broadly put, when a state claim is brought in federal court, do federal or state rules determine whether an expert witness can testify about elements of that cause of action? Specifically, and as applied here, did the district court err in excluding Dr. Bilbro's standard-of-care evidence because he did not satisfy certain requirements that are set out

22

in North Carolina Rule of Evidence 702(b) for an expert witness testifying about the standard-of-care in a North Carolina medical malpractice claim?

At first blush, the answer to that question may appear deceptively simple, but it becomes complex in its execution. As every first-year law student learns, the *Erie* doctrine provides that a federal court sitting in diversity applies federal procedural rules and state substantive rules. 304 U.S. at 78. While that framework has straightforward application in many contexts, it has led to confusion at times when determining whether a particular state law is best characterized as "procedural" or "substantive." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). But one caveat to the *Erie* doctrine is that it does not control the analysis when a valid federal provision is directly on point. *Id.* at 427 n.7. And, as the Supreme Court reiterated in *Shady Grove*, when a federal rule "answers the question in dispute," "it governs—[state] law notwithstanding—unless it exceeds statutory authorization or Congress's rulemaking power. We do not wade into *Erie*'s murky waters unless the federal rule is inapplicable or invalid." 559 U.S. at 398 (internal citations omitted).

Moreno cites these principles as the basis for contending that the district court erred in relying on North Carolina Rule of Evidence 702(b) to exclude Dr. Bilbro's testimony. In his view, there's a federal rule governing the admissibility of expert testimony in federal court—FRE 702—so it, not North Carolina Rule of Evidence 702(b), governed whether to admit Dr. Bilbro's testimony. And he points out that because Dr. Bosholm did not assert that Dr. Bilbro's testimony was inadmissible under FRE 702, his testimony should have been admitted.

23

To be sure, FRE 702 addresses when expert testimony can be admitted in federal court. That rule allows a witness "who is qualified as an expert by knowledge, skill, experience, training, or education [to] testify in the form of an opinion or otherwise" when certain criteria are satisfied regarding the foundation for and reliability of his opinions. Fed. R. Evid. 702. In its present form, it enshrines principles set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and thus supplies "the governing standard for evaluating proposed expert testimony," including "a district court's gatekeeping responsibility to ensure that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task at hand." *Nease v. Ford Motor Co.*, 848 F.3d 219, 228–29 (4th Cir. 2017) (cleaned up; emphasis in original).

But FRE 702 is not the exclusive rule governing the admissibility of expert testimony. Testimony admissible under FRE 702 may nonetheless be inadmissible under another federal evidentiary rule. *See, e.g.*, *Daubert*, 509 U.S. at 595 ("[A] judge assessing a proffer of expert scientific testimony under [FRE] 702 should also be mindful of other applicable rules."). And, as alluded to earlier, FRE 601 addresses how to determine the competency of *every* witness testifying in federal court. It first declares all persons "competent to be a witness unless [the FREs] provide otherwise," and then specifically provides in its second sentence that, "*in a civil case, state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision*." Fed. R. Evid. 601 (emphasis added); *see Hottle v. Beech Aircraft Corp.*, 47 F.3d 106, 107 n.1 (4th Cir. 1995) ("It is generally true that the Federal Rules of Evidence require a district court sitting in diversity to defer to applicable state rules on . . . competency." (citing Fed.

24

R. Evid. 601)); *see also Rosenfeld v. Basquiat*, 78 F.3d 84, 88 (2d Cir. 1996) (stating that because the *Erie* doctrine provides that state law will supply the law of decision in "diversity-of-citizenship cases," FRE 601 required the court to apply a state law "barring the testimony of certain interested witnesses").

Consequently, Moreno's question presented requires us to consider whether FRE 601 directs federal courts to apply North Carolina Rule of Evidence 702(b). In other words, does that state rule "govern[] the witness's competency regarding a claim . . . for which state law supplies the rule of decision"? Fed. R. Evid. 601. More precisely, because no one disputes that Moreno's medical malpractice claim is a "claim . . . for which state law supplies the rule of decision" in federal court, we must answer a narrower question: does North Carolina Rule of Evidence 702(b) "govern[] the witness's competency"? *Id.* The answer to that question is "yes."

The Federal Rules of Evidence do not define "competency," so we turn to familiar principles to discern the term's meaning. When a word is not defined, it "is to be used as it is commonly and ordinarily understood." *Ins. Servs. of Beaufort, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d 847, 852 (4th Cir. 1992). Black's Law Dictionary defines "competence" in this context to mean "[a] basic or minimal ability to do something; adequate qualification, esp. to testify." *Competence*, *Black's Law Dictionary* (12th ed. 2024). Non-legal dictionaries are in accord. *See, e.g.*, *Competence*, *Webster's Third New Int'l Dictionary* (2002 ed.) ("[T]he quality or state of being functionally adequate or of having sufficient knowledge, judgment, skill, or strength (as for a particular duty or in a particular respect)[;] range of ability or capability[;] legal authority, ability, or admissibility[;] legitimacy or

25

validity of a conclusion, logical process, point of view[.]"); *Competency*, *Oxford English Dictionary* (last visited July 10, 2025), https://doi.org/10.1093/OED/7246314569 [https://perma.cc/4WPT-XV5H], ("Sufficiency of qualification; capacity"). Thus, a state rule governing a "witness's competency" is one that addresses a witness's "ability to" or "authority" to testify; that is, it encompasses aspects of that witness's "qualifications."

North Carolina Rule of Evidence 702(b) falls within FRE 601's scope because it governs a witness's "ability to," "authority," or "qualifications" to testify on a particular element of a state-law claim. As already detailed, that rule sets out certain professional qualifications a witness must satisfy before they are permitted to "give expert testimony on the appropriate standard of health care" in a state medical malpractice claim. N.C. R. Evid. 702(b). While the type of testimony the state evidentiary rule addresses is "expert testimony" on a particular claim, it's targeting what qualities that *witness* must possess before he can testify. That's quintessentially a rule governing witness competency.

Our understanding of FRE 601's scope to encompass North Carolina Rule of Evidence 702(b) is consistent with the holdings of all four circuit courts of appeals to have addressed this question in related contexts. *Coleman*, 912 F.3d at 829–34; *Liebsack*, 731 F.3d at 855–57; *McDowell*, 392 F.3d at 1294–97; *Legg*, 286 F.3d at 289–92. In each case, the plaintiff brought either a state medical malpractice claim pursuant to the court's diversity jurisdiction or a Federal Tort Claims Act (FTCA) claim that required the court to look to a state's medical malpractice law to determine liability. *Coleman*, 912 F.3d at 829 (FTCA claim determined by Texas medical malpractice law); *Liebsack*, 731 F.3d at 854–55 (FTCA claim determined by Alaska medical malpractice law); *McDowell*, 392 F.3d at

26

1294 (Georgia medical malpractice claim); *Legg*, 286 F.3d at 288 (Tennessee medical malpractice claim). In each case, a state law restricted who could testify as an expert as to the standard of care applicable to the state medical malpractice claim, and the parties disputed whether a professional qualification requirement of that state law applied in federal court. *Coleman*, 912 F.3d at 829–30 (Texas law contained a "practicing medicine" requirement for such experts); *Liebsack*, 731 F.3d at 854–55 (Alaska required of such experts licensure, training in the same discipline or area as the defendant, and board certification acknowledging said expertise and training); *McDowell*, 392 F.3d at 1296 (Georgia required such experts to demonstrate "knowledge of the standard of care applicable to the defendant-professional as to at least one of the matters on which the plaintiff's malpractice claim is based" (internal quotations omitted)); *Legg*, 286 F.3d at 289 (Tennessee required such experts to be licensed "in the state or a contiguous border state" (internal quotations omitted)). And in each case, the circuit court held that FRE 601 required district courts to apply the relevant state's law governing whether the expert was competent to testify as an expert on the applicable standard of care and its breach. *Coleman*, 912 F.3d at 831 ("[W]e hold that [FRE] 601 requires federal courts to apply state rules for expert witness qualification when determining the competency of expert witnesses to testify regarding medical malpractice claims that turn on questions of state substantive law."); *accord Liebsack*, 731 F.3d at 855–57; *McDowell*, 392 F.3d at 1294–95; and *Legg*, 286 F.3d at 289–92. To be clear, the holdings in each of these circuits would similarly conclude that North Carolina Rule of Evidence 702(b) is a state witness competency rule,

meaning that FRE 601 required Dr. Bilbro to satisfy its threshold requirements before his testimony could be admitted. No circuit court has reached a different conclusion.[13]

b.

Moreno offers several arguments in favor of a different reading of FRE 601's scope, none of which persuade us. Those arguments can be distilled into two overarching and at times intertwined propositions. First, he offers various reasons why he believes we should divine a meaningful difference between the question of witness "competency" under FRE 601 and an expert witness's "qualifications" under North Carolina Rule of Evidence 702(b). Among other things, he points to the relevant rules' use of these different terms, the enactment history of FRE 601, and the placement of North Carolina Rule of Evidence 702(b) within the state evidentiary rules as grounds for asserting that FRE 601 addresses something different than what North Carolina Rule of Evidence 702(b) addresses. Second, he argues that interpreting FRE 601 to encompass state rules such as this one will cause FRE 601's competency of witnesses' inquiry to displace FRE 702's qualification of expert witnesses' inquiry. We disagree.

Contrary to Moreno's contention, FRE 601's use of "competency" encompasses rules regarding a witness's "qualifications." In short, "competency" rules ask if "a

---

[13] We recognize that some of these cases rely on an *Erie* analysis classifying the state rules issue as "procedural" versus "substantive." To the extent that the *Erie* doctrine or concerns about respecting individual states' differing competency rules or forum shopping informed Congress' decision to enact FRE 601 as written, those concepts may be relevant to the analysis in the abstract. But they do not factor directly into our own analysis, which takes FRE 601—itself a federal rule that applies in federal courts—as it is written and proceeds from that starting point to understand the rule's scope.

prospective witness is qualified to give any testimony at all in the case." 1 *McCormick on Evidence* § 61 (9th ed. 2025) . And, as already noted, common definitions of "competency" contain the word "qualification" or its variants when discussing what it means to be "competent." Unsurprisingly, the legal definition of "qualification" also uses language that shows similar overlap with what it means to be "competent" to testify on a particular matter. *Compare Competence*, *Black's Law Dictionary* (12th ed. 2024) ("A basic or minimal ability to do something; adequate qualification, esp. to testify"), *with Qualification*, *Black's Law Dictionary* (12th ed. 2024) ("The possession of qualities or properties (such as fitness or capacity) inherently or legally necessary to make one eligible . . . to perform a public duty or function[.]"). Simply put, FRE 601 governs a witness's competency and necessarily includes a witness's qualifications to testify. 27 *Wright & Miller's Federal Practice & Procedure* § 6003 (2d ed. 2025) ("Competency under [FRE] 601 may be defined as the presence of those characteristics that *qualify* and the absence of those disabilities that *disqualify* a person from testifying." (emphases added)). Drawing lines simply as a result of one rule using one term and another rule using another term would be antithetical to the principle that undefined words are understood to retain their common meaning and would artificially limit FRE 601's scope.[14]

---

[14] Moreno's proposed restrictive reading also misapplies the meaningful variation canon of interpretation. *See, e.g.*, *Valladares v. Ray*, 130 F.4th 74, 82 (4th Cir. 2025) ("Under [the meaningful variation] canon of statutory interpretation, 'where a document has used one term in one place, and *a materially different term in another*, the presumption is that the different term denotes a different idea.'" (quoting *S.W. Airlines Co. v. Saxon*, 596 U.S. 450, 457–58 (2022)) (emphasis added)); *accord Pulsifer v. United States*, 601 U.S. (Continued)

Our cases discussing a witness's "competency" have also understood that term to encompass aspects of a witness's "qualifications" to testify. For example, cases from before the adoption of the Federal Rules of Evidence referred to the concepts of an expert witness's qualifications and competency interchangeably when discussing how that individual obtained the training and knowledge required to offer admissible testimony on a matter. *E.g.*, *Mahaffy & Harder Eng'g Co. v. Standard Packaging Co.*, 389 F.2d 525, 530 (4th Cir. 1968); *Boleski v. Am. Exp. Lines, Inc.*, 385 F.2d 69, 71–72 (4th Cir. 1967). And in the decades since the adoption of the Federal Rules of Evidence, when discussing FRE 601, we have similarly referred to it as addressing, again interchangeably, a witness's "competency" and "qualifications." *See, e.g.*, *United States v. Odom*, 736 F.2d 104, 112 (4th Cir. 1984) ("[FRE 601], which is the controlling guide in federal criminal courts on *qualifications* of witnesses, represents . . . the culmination of the modern trend which has converted questions of *competency* into questions of credibility . . . . Under [FRE 601] every witness is presumed to be *competent*. Neither feeble-mindedness nor insanity renders a witness *incompetent or disqualified*." (cleaned up and emphases added)). Our sister circuits—in this and other contexts—have also discussed FRE 601 using both terms interchangeably. *See, e.g.*, *Coleman*, 912 F.3d at 831 (holding that FRE 601 "requires federal courts to apply state rules for expert witness *qualification*" in certain circumstances (emphasis added)); *Liebsack*, 731 F.3d at 854 (characterizing the issue as whether the

_____

124, 149 (2024) ("In a given statute, the same term usually has the same meaning and different terms *usually* have different meanings." (emphasis added)).

30

expert witness was "qualified" under the Alaska statute applicable in federal court because of FRE 601); *McDowell*, 392 F.3d at 1295 (observing that FRE 601 required it to determine "whether the expert is *qualified* to render an opinion regarding the standard of care (the competency component)" (emphasis added)); *Legg*, 286 F.3d at 291 (discussing the Tennessee expert witness requirements as showing the "relationship between the standard of care and the *qualification* requirements of the medical expert who will establish that standard" before concluding that FRE 601 required the court to apply the Tennessee requirements (emphasis added)); *United States v. Dysart*, 705 F.2d 1247, 1251 (10th Cir. 1983) (noting that FRE 601 has "greatly reduced" "[t]he court's responsibility to determine the[] preliminary questions of *qualification* to testify" under FRE 104(a) given that it "makes all witnesses competent" save for certain situations (emphasis added)).

All this to say, we see nothing in our case law that supports Moreno's attempt to cabin the scope of FRE's "competency" directive to something different from rules governing aspects of an expert witness's "qualifications" to render such testimony.[15]

---

[15] As part of his argument, Moreno also points out that North Carolina Rule of Evidence 702 does not use the word "competency" and instead uses variants of an expert's "qualifications," but North Carolina case law reveals that this is a distinction without a difference. Indeed, North Carolina courts have referred to the rule as addressing an expert witness's "qualifications" and "competency" interchangeably, sometimes within the same discussion. *See Da Silva v. WakeMed*, 846 S.E.2d 634, 638 (N.C. 2020); *see also Moore v. Proper*, 726 S.E.2d 812, 821 (N.C. 2012) (Newby, J., concurring in part) (quoting the rule's legislative history to show that even the General Assembly used "qualified" and "competence" interchangeably ); *Crocker v. Roethling*, 675 S.E.2d 625, 629–32 (N.C. 2009) (discussing the evidentiary rule in terms of establishing the "competency" of an expert witness to testify). So, notwithstanding North Carolina Rule of Evidence 702(b)'s failure to use the word "competency," North Carolina courts nonetheless treat it as one addressing a witness's competency to testify.

We also observe that the Advisory Committee Notes to FRE 601 do not support Moreno's restrictive interpretation. Those notes confirm that FRE's first sentence eliminated grounds such as "religious belief, convictions of crime, and connection with the litigation as a party or interested person," and other "mental or moral *qualifications*" as a reason to prevent an individual from testifying. Fed. R. Evid. 601 advisory committee notes (emphasis added). They also reflect that the second sentence of FRE 601, directing courts to apply state competency rules in certain circumstances, had its impetus in respecting states' different approaches to so-called Dead Men's Acts. *Id.* Of course, the language of FRE 601 itself is not limited to that context in which it arose, and it more broadly calls for *any* state competency rule to apply when the other provisos are satisfied. Fed. R. Evid. 601; *accord* 27 *Wright & Miller's Federal Practice & Procedure* § 6003 (2d ed. 2025) (relying on FRE 601's plain language and legislative history to observe that its "scope extends to the full extent of [witness competency and] it cannot be tenably argued that the provision applies only to state Dead Man's Acts and not to all other state competency rules").

That the second sentence of FRE 601 has its origin in respecting the states' various approaches to the Dead Man's statutes further supports our conclusion that FRE 601 requires the application of North Carolina Rule of Evidence 702(b) in this context. Generally speaking, those laws acted in derogation of the common law to prohibit "the admission of a decedent's statement as evidence in certain circumstances, as when an opposing party or witness seeks to use the statement to support a claim against the decedent's estate." *Dead Man's Statute*, *Black's Law Dictionary* (12th ed. 2024). This background confirms that when enacting the second sentence of FRE 601, Congress

32

understood that it would apply not just to competency rules that prohibited certain individuals from *ever* testifying in federal court, but also to competency rules that prohibited certain individuals from testifying on particular matters in specific cases. So, recognizing that the second sentence of FRE 601 extends to *other* state competency rules—such as North Carolina Rule of Evidence 702(b)—that prohibit certain witnesses from testifying on particular matters in specific cases falls comfortably within that enactment history. In sum, the advisory committee's notes on FRE 601 confirm that as long as North Carolina Rule of Evidence 702(b) is a state competency rule, then FRE 601 requires its application as part of assessing whether the witness can testify about any claim to which it applies.

Moreno also points to Wright & Miller's respected *Federal Practice & Procedure* treatise as a basis for arguing that FRE 601 should not be interpreted to apply to North Carolina Rule of Evidence 702(b). That argument, however, cherry picks quotations from their fuller context, while the entirety of the treatise's discussion of FRE 601 supports our understanding of what constitutes a state rule governing witness "competency." *See generally* 27 *Wright & Miller's Federal Practice & Procedure* §§ 6001–6008 (2d ed. 2025) (discussing FRE 601's scope). This treatise, just like the other sources already discussed, defines "competency" as a particular aspect of a witness's *qualifications* to testify. *E.g.*, *id.* § 6003 ("Competency under [FRE] 601 may be defined as the presence of those characteristics that qualify and the absence of those disabilities that disqualify a person from testifying."). What's more, Wright & Miller's treatise explains that FRE 601 governs the admissibility of an expert witness's qualifications (competency) to testify in federal

33

court on covered matters of state civil claims when "the challenge to the competency of [that] expert witness is based on grounds" such as North Carolina Rule of Evidence 702(b)'s active clinical practice requirement. *Id.* § 6003 n.18 (discussing the interplay between FREs 601 and 702 when it comes to expert witnesses testifying in federal court about state-law claims). Indeed, Wright & Miller cites *Coleman*, *Liesback*, *McDowell*, and *Legg* as support for its understanding that FRE 601 controls certain threshold matters of expert witness competency before a court turns to the admissibility of the expert witness's opinion testimony, which is governed by FRE 702. *Id.*[16]

For each of these reasons, we reject Moreno's attempt to carve distinct meaning from FRE 601's use of the word "competency" versus "qualifications" to distinguish its scope.

Nor are we persuaded that North Carolina Rule of Evidence 702(b)'s placement within a certain part of North Carolina law requires a different result. As Moreno points out, some of the other circuit courts that have interpreted FRE 601 as we do here have issued decisions in the context of a medical malpractice claim that contained a rule about witness competency or qualifications directly in the same title of the state code that

---

[16] In furtherance of this misguided argument, Moreno urges the Court to read the Sixth and Eleventh Circuits in *McDowell* and *Legg*, respectively, to have reached their conclusions only because the state rule at issue labeled itself as one involving an expert witness's "competency," not his "qualifications." That argument misreads those cases as well as the substance of the state rules at issue.

34

discusses health care liability. *See Coleman*, 912 F.3d at 829–30; *Legg*, 286 F.3d at 291.[17]

In contrast, North Carolina Rule of Evidence 702(b) is part of the state's Rules of Evidence rather than being located in or near its medical malpractice cause of action, N.C. Gen. Stat. § 90-21.11.

We do not find this placement at all determinative. FRE 601 directs federal courts to apply "state law govern[ing] the witness's competency regarding a [state law] claim" without restriction on where the state law is located. North Carolina's other competency rules are also found within its code of evidence, but they are no less rules of competency for it.  *See, e.g.*, N.C. R. Evid. 601. And North Carolina Rule of Evidence 702(b) unquestionably represents "state law" governing the competency of a witness testifying about North Carolina's medical malpractice action. The state's medical malpractice statutes specifically define a "medical malpractice" action, N.C. Gen. Stat. §  90-21.11(2)(a), and speak specifically to what evidence a plaintiff must come forward with to establish liability in such an action, providing, in relevant part, that physicians

> shall not be liable . . . unless the trier of fact finds by the greater weight of the evidence that the care of such health care provider was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar

---

[17] The Texas and Tennessee laws at issue in *Coleman* and *Legg* set out an expert witness's qualifications in a separate section of the code devoted to expert witnesses testifying in cases involving medical and health care liability. But distance existed between the medical malpractice titles and the reviewed state competency rules at issue in *McDowell* and *Liebsack*. The Georgia rule at issue in *McDowell* derived from case law discussing a pleading requirement found in the Georgia statutes regarding civil practice pleading, 392 F.3d at 1296, and the Alaska statute at issue in *Liebsack* was part of the code addressing trial witnesses generally,  731 F.3d at 854).

communities under the same or similar circumstances at the time of the alleged act giving rise to the cause of action.

N.C. Gen. Stat. § 90-21.12(a). While neither statute sets out a competency rule for expert witnesses testifying as to this standard and its breach, North Carolina Rule of Evidence 702(b) does. *See* N.C. R. Evid. 702(b) (providing the rule for an expert's competency specifically "[i]n a medical malpractice action as defined in [§] 90-21.11"). That rule was adopted by North Carolina's General Assembly and codified as part of N.C. Gen. Stat. § 8C-1, so it equally carries the imprimatur of legislative intent regarding the state's medical malpractice claims, regardless of it appearing in a different part of North Carolina's statutory scheme. North Carolina Rule of Evidence 702(b) expressly cross-references the state's medical malpractice statutes, stating, in relevant part, that "[i]n a medical malpractice action as defined in G.S. 90-21.11, a person shall not give expert testimony on the appropriate standard of health care as defined in G.S. 90-21.12 unless the person" meets certain criteria. N.C. R. Evid. 702(b). That cross-reference satisfies any purported statutory distance for purposes of our endeavor here.

On this slate, we find that the expert witness competency requirements of North Carolina Rule of Evidence 702(b) establishes the North Carolina General Assembly's requirement of how its substantive medical malpractice cause of action is to be proven just as clearly as if it had been enacted as part of the statute creating the cause of action. *Cf. State v. McGrady*, 787 S.E.2d 1, 7 (N.C. 2016) ("When we interpret the North Carolina Rules of Evidence, as when we interpret other statutes, the cardinal principle is to discern the intent of the legislature." (cleaned up)). Beyond speculating on a dispositive structural

36

difference, Moreno offers no principled basis for treating North Carolina Rule of Evidence 702(b)'s substantive text differently based on its inclusion in a rule of evidence that cross-references the cause of action to which it applies as opposed to its inclusion directly in that statute. His approach asks us to elevate form over substance, and would lead to untenable results.

c.

To this point, we've addressed FRE 601's scope by looking solely to its language, enactment, and application, but we must also address its interplay with FRE 702. At the outset, however, we emphasize FRE 601 is a federal rule that itself directs federal courts to apply state witness competency rules to a state-law civil claim. Applying FRE 601 as we have done means that we are not "wad[ing] into *Erie*'s murky waters," but rather recognizes that more than one federal rule may speak to "the question in dispute." *Shady Grove*, 559 U.S. at 398.[18] We are not in the arena of a federal court engaging in an *Erie* analysis, but

---

[18] Based on a similar recognition, we reject Moreno's assertion that we have already held that FRE 702 alone governs the admissibility of expert testimony in federal court. As support, Moreno relies on our decision in *Scott v. Sears, Roebuck & Co.*, 789 F.2d 1052 (4th Cir. 1986). There, the plaintiff introduced testimony from an expert witness on so-called "human factors" to avoid the defense of contributory negligence in a slip-and-fall case. *Id.* at 1054. The defendant objected, arguing that such "'human factors' expert testimony [wa]s inadmissible in the courts of Virginia," and that it "should have been excluded in a federal court sitting in" diversity and considering a state-law tort claim. *Id.* We disagreed with that argument, observing that, "[u]nlike evidentiary rules concerning burdens of proof or presumptions, the admissibility of expert testimony in a federal court sitting in the diversity jurisdiction is controlled by federal law. State law, whatever it may be, is irrelevant." *Id.*

Moreno views *Scott*'s declaration that "federal law" controls and "[s]tate law . . . is irrelevant" to dictate the outcome of this case. *See id.* Again, we disagree.

(Continued)

37

rather a more straightforward application of the federal rules of evidence as they've been enacted. And the interplay between FRE 601 and FRE 702 is just that—looking at how two federal rules work together to determine the admissibility of certain witness testimony.

As the other circuits to address this issue have concluded, we see no conflict between our understanding of FRE 601's scope to encompass North Carolina Rule of Evidence 702(b) and the role that FRE 702 also plays in determining the admissibility of expert testimony in federal court. Instead, FREs 601 and 702 work "in tandem." *Legg*, 286 F.3d at 291; *see also Coleman*, 912 F.3d at 833 (rejecting the argument that this interpretation of FRE 601 "displaces the question of admissibility under [FRE] 702" and finding that the two rules "complement[]" each other). In the limited number of cases in which FRE 601's second sentence applies, it requires district courts to ask a threshold

*Scott* addressed a potential direct conflict between the *type* of expert testimony admissible under federal and state law, a question that could be resolved solely by looking to FRE 702. *Id.* at 1054–55. The Court did not discuss, nor did the issue before it implicate, the potential applicability of FRE 601 and whether the expert witness was *competent* to testify on that Virginia claim or defense. *Cf. Sarkees v. E.I. Dupont De Nemours & Co.*, 15 F.4th 584, 588 & n.4 (2d Cir. 2021) (citing *Scott* and cases from other circuit courts as interpreting FRE 702 to require federal courts "to admit expert testimony even when a state rule of evidence may have excluded the evidence if offered in a state court," but recognizing that this approach does not mean that "state law is necessarily irrelevant to all evidentiary issues in diversity suits" given the second sentence of FRE 601); *Coleman*, 912 F.3d at 832–33 (citing similar language from Fifth Circuit case law and observing that those cases did not involve application of the second sentence of FRE 601, which is itself a federal rule directing courts to use state rules in certain circumstances).

In short, there is nothing inconsistent with *Scott*'s recognition that on-point federal rules of evidence govern the admissibility of evidence relating to claims heard pursuant to the federal courts' diversity jurisdiction and what we do here. FRE 601 is just as much a federal rule as FRE 702, and to the extent it bears on who can testify about what in federal court, *Scott* directs us to consider both rules.

question about a proffered witness's competency, directing federal courts to apply state rules. After ensuring that the witness satisfies that state competency rule (as a result of FRE 601's directive), the federal court can then address whether the substance of the witness's testimony is otherwise admissible under FRE 702 or any other applicable provision of law. *Legg*, 286 F.3d at 292 ("Thus, if a witness is deemed competent to testify to the substantive issue of the case, such as the standard of care, his or her testimony should then be screened by Rule 702 to determine if it is otherwise admissible expert testimony."). When the competency of an expert is decided by the second sentence of FRE 601, then the court's FRE 702 inquiry focuses on "the science and methodology behind the witness's testimony" in a particular case. *Id.* at 291; *accord Liebsack*, 731 F.3d at 857 (observing that "a witness might satisfy the specialization and certification requirements [under a state rule of competency], but her testimony would be inadmissible if, under Rule 702, it is not based on sufficient facts or data because possessing requisite credentials alone is not enough to render expert testimony admissible" (cleaned up)).

In other words, the two federal rules are entirely reconcilable, and it is not a matter of prioritizing one over the other, but ensuring that both have been satisfied before an expert witness's testimony is admitted in federal court. *Coleman*, 912 F.3d at 833 ("[A]n expert's testimony might be admissible under Rule 702, yet the witness himself barred under Rule 601 when relevant state law deems him legally incompetent to testify on the matter. Conversely, an expert might be legally competent to testify under Rule 601, yet nonetheless offer testimony that is inadmissible under Rule 702."). Instead, FRE 601 directs federal courts to apply state rules about the competency of any witnesses (including experts) to

39

testify in a case to which FRE 601 otherwise applies, but it does not direct federal courts to apply state rules about the qualities that the expert testimony itself must possess to be admissible.[19]

\* \* \* \*

The foregoing analysis allows us to answer the question Moreno posed, which was whether the district court abused its discretion "by applying state evidentiary rules to limit the testimony of [his] expert witness when federal rules of evidence, not state rules, apply in federal court." Opening Br. 3. The district court did not abuse its discretion in applying North Carolina Rule of Evidence 702(b) as the basis for deciding if Moreno's expert witness was qualified to testify as to the standard of care applicable in his medical malpractice claim because FRE 601 directs that federal courts apply such a state competency rule to state claims pursued in federal court. Moreno does not contend that Dr. Bilbro satisfied North Carolina Rule of Evidence 702(b)'s requirements if they applied to the question of his competency to testify about the standard of care applicable to Moreno's medical malpractice claim. We therefore affirm the district court's decision to exclude that testimony.

---

[19] By its plain language, FRE 702's inquiry may otherwise require federal courts to address some aspects of an expert witness's "qualifications" before allowing testimony to be admitted. But that inquiry focuses on the formation of the expert opinion under review, and ensuring that it is based on a sufficiently reliable foundation to be admissible. *See, e.g.*, *Nease*, 848 F.3d at 228–29. At times, that inquiry may overlap with aspects of what a state rule requires of a proffered expert witness to be deemed competent to testify in the first instance. But incidental overlap is common within evidentiary rules and does not render one or the other inapplicable to situations falling plainly within their scope.

Apart from challenging that evidentiary ruling, Moreno does not assert any error in the district court's grant of judgment as a matter of law as to his medical malpractice claim. Without competent testimony establishing the standard of care or its breach, the claim could not survive Dr. Bosholm's motion for judgment as a matter of law. Therefore, the district court did not err in entering judgment on that claim in Dr. Bosholm's favor and we now affirm that part of the judgment.

## B.  Other Claims

We review de novo the district court's grant of Dr. Bosholm's motion for judgment as a matter of law. *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 240 (4th Cir. 2009). Under Federal Rule of Civil Procedure 50(a), "a district court may grant [such a motion] during a jury trial . . . only if there is no legally sufficient basis for a reasonable jury to have found for that party with respect to that issue." *Id.* (cleaned up).

Moreno's arguments for both his gross negligence and deliberate indifference claims largely follow the same path. He argues that the district court erred in granting judgment as a matter of law because the trial record would permit a jury to infer that Dr. Bosholm (1) knew that Moreno had the flu, (2) disregarded the risks associated with "failing to monitor [his] respiration" and "measuring his blood's oxygen" saturation levels during the weekend quarantine, Opening Br. 26, and (3) further knew that weekend SCI medical staff would not specifically measure an inmates' oxygen saturation levels and respiration rate as part of routine monitoring unless expressly instructed to do so. From this stacking of inferences, he asserts a jury could have concluded that Dr. Bosholm's failure to leave specific monitoring instructions constituted conscious disregard for or reckless indifference

41

to the risk that Moreno's oxygen saturation and respiration rate would deteriorate to levels requiring intervention over the weekend, before they reached a critical state on Monday.

While North Carolina gross negligence and deliberate indifference have different elements, both require proof that the defendant's conduct that caused plaintiff injury was more culpable than mere negligence but not to the level of being intentional. *Weatherford v. Glassman*, 500 S.E.2d 466, 470 (N.C. Ct. App. 1998) (gross negligence); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (deliberate indifference). Similarly, cases discussing both claims have cautioned that ordinary allegations of medical malpractice are not sufficient to establish that the defendant acted with the requisite heightened level of culpability to establish either gross negligence or deliberate indifference. *Weatherford*, 500 S.E.2d at 470 (gross negligence); *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976) (deliberate indifference). As explained next, because the record lacks any evidence to support this common element of Moreno's remaining claims, we affirm the district court's judgment in favor of Dr. Bosholm.

## 1. Gross Negligence

In large part, our earlier analysis dispenses with Moreno's gross negligence claim. Under North Carolina law, to prevail on such a claim, a plaintiff must come forward with proof of all four elements of an ordinary negligence (medical malpractice) claim as well as proof that the defendant acted "with conscious or reckless disregard for the rights and safety of others." *Land v. Whitley*, 898 S.E.2d 17, 26 (N.C. Ct. App. 2024) (internal

42

quotations omitted).[20] Thus, to the extent Moreno argues that the district court's exclusion

of Dr. Bilbro's testimony under North Carolina Rule of Evidence 702(b) also improperly

impeded his ability to prove the elements of his gross negligence claim, that argument fails

for the reasons already discussed.

But Moreno also contends that his gross negligence claim should have survived

regardless of the admissibility of Dr. Bilbro's standard-of-care testimony because Dr.

Bosholm's actions were so egregious that a jury could have found her to be grossly

---

[20] We note some imprecision in North Carolina cases about what constitutes "gross negligence," but we need not explore or resolve every nuance of North Carolina's case law to address Moreno's argument. North Carolina courts regularly use the terms "willful" or "wanton" to define the quality of conduct required to establish gross negligence. *Cullen v. Logan Devs., Inc.*, 904 S.E.2d 730, 737 (N.C. 2024) ("Whereas ordinary negligence involved inadvertence of carelessness, we have used the term gross negligence in the sense of wanton conduct. An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." (cleaned up)); *see also Yancey v. Lea*, 550 S.E.2d 155, 158 (N.C. 2001), *superseded on other grounds by Piazza v. Kirkbride*, 827 S.E.2d 479 (N.C. 2019), (describing the difference between negligence and gross negligence as qualitative—conduct that is "inadverten[t]," on the one hand, compared to acts "done purposely and with knowledge that such act is a breach of duty to others, *i.e.*, a conscious disregard to the safety of others," on the other).

Citing several North Carolina cases, Moreno likens North Carolina's standard for gross negligence to that of deliberate indifference, arguing that he has come forward with evidence that Dr. Bosholm acted with "conscious or reckless disregard" to his rights and safety. Opening Br. 30. We agree that this is the standard to use in examining whether the district court erred in granting Dr. Bosholm's motion for judgment as a matter of law as to this claim. *See, e.g.*, *Clayton v. Branson*, 613 S.E.2d 259, 265–66 (N.C. Ct. App. 2005) (observing, in the context of a gross negligence claim brought against law enforcement officer, that evidence that the defendant "drove 30 or 35 miles above the legal speed limit" while knowing "plaintiff was not wearing a seat belt, and that he had to brake suddenly and swerve the car to avoid a collision," established ordinary negligence, but fell "far short of the threshold of gross negligence," which requires that "the [defendant's] *act* is done purposely and with a conscious disregard of the safety of others" (cleaned up, emphasis in original)). But, as set out above, Moreno's proffered evidence simply doesn't meet this standard.

43

negligent without the benefit of such expert testimony. Moreno's argument rests on an exception to North Carolina's ordinary understanding that the standard of care and its breach must be established through expert testimony, which applies when "a physician's conduct is so grossly negligent or the treatment is of such a nature that the common knowledge of laypersons is sufficient to find the standard of care required, a departure therefrom, or proximate causation." *Bailey v. Jones*, 435 S.E.2d 787, 792 (N.C. Ct. App. 1993); *accord Weatherford*, 500 S.E.2d at 470.[21] These cases provide some tangential support for Moreno's contention that he could alternatively prove his claim of gross negligence based on record evidence establishing Dr. Bosholm's willful or wanton conduct, even in the absence of specific evidence establishing a standard of care and its breach. *See Weatherford*, 500 S.E.2d at 470.

Even accepting this proposition of state law, however, we disagree that the trial record is sufficient to permit a jury to find willful or wanton conduct. As an initial matter, the cases in which North Carolina courts have not required evidence of the standard of care

---

[21] The common knowledge side of this exception closely mirrors the doctrine of *res ipsa loquitur*. *See Diehl v. Koffer*, 536 S.E.2d 359, 362 (N.C. Ct. App. 2000) ("[I]n order for *res ipsa loquitur* to apply, the negligence complained of must be of the nature that a jury—through common knowledge and experience—could infer."); *see also* (*Bluitt v. Wake Forest Univ. Baptist Med. Ctr.*, 814 S.E.2d 477, 480–81 (N.C. Ct. App. 2018) (discussing the rarity with which *res ipsa loquitur* applies in the medical malpractice context); *Hayes v. Peters*, 645 S.E.2d 846, 848 (N.C. Ct. App. 2007) (same). And in that context, North Carolina courts have long recognized that the *res ipsa loquitur* doctrine does not extend to routine arguments that the defendant's medical care to the plaintiff "was not satisfactory or less than could be desired, or different from what might be expected." *Mitchell v. Saunders*, 13 S.E.2d 242, 245 (N.C. 1941). This understanding further informs *our* understanding of how North Carolina courts consider when gross negligence can be shown without expert testimony specifically addressing the standard of care and its breach.

44

and its breach are qualitatively different from what allegedly occurred here, with examples ranging from failing to sterilize an open wound before setting a protruding bone to leaving foreign objects in a patient's body during surgery. *Bailey*, 435 S.E.2d at 792. More to the point, North Carolina courts have not found willful or wanton conduct in cases asserting, without more, that the defendant's treatment of the plaintiff's condition should have been different or better. *Accord Green ex rel. Crudup v. Kearney*, 719 S.E.2d 137, 145 (N.C. Ct. App. 2011) (observing, in the context of a gross negligence claim brought against first responders, that evidence concerning how a defendant's conduct fell below an applicable standard of care supports only "ordinary medical negligence" unless it "identif[ies] any factors which would elevate the actions of [the] defendant[] to gross negligence"). To the contrary, North Carolina courts have specifically rejected the notion that a physician's alleged misdiagnosis or failure to properly examine a plaintiff would independently establish that the defendant engaged in willful or wanton conduct for purposes of a gross negligence claim. *Weatherford*, 500 S.E.2d at 470.

Furthermore, we disagree with Moreno's assessment that the trial record permits a finding of "gross" negligence, i.e., willful or wanton conduct evincing a conscious or reckless disregard of Moreno's health. As the district court observed, it is undisputed that on Friday, February 26, Dr. Bosholm reviewed Nurse Sullivan's notes, diagnosed Moreno based on his complaints and the results of the physical examination and vital statistics assessed at that time, and rendered instructions for how to proceed (medication, monitoring, and quarantine). At trial, Dr. Bosholm testified that she was "concerned that

45

[the quarantined inmates] might have an infectious disease like influenza," so she "want[ed] the [weekend] nurses to monitor" them. J.A. 451.

Presented with this uncontradicted record that Dr. Bosholm provided *some* responsive medical care to Moreno on Friday afternoon, Moreno is left with the assertion that what she did was insufficient and that she should have done more to prevent what happened to him. As previously pointed out, however, that sort of argument sounds within the classic parameters of medical malpractice (ordinary negligence) rather than constituting the sort of conduct necessary to show gross negligence. *See, e.g.*, *Yancey*, 550 S.E.2d at 157 (observing that gross negligence requires proof that the defendant acted with "*conscious* disregard of the safety of others" as opposed to acting with mere "inadvertence or carelessness," which constitutes ordinary negligence (emphasis in original)); *Weatherford*, 500 S.E.2d at 470. Simply put, the trial record contains no evidence that would elevate Dr. Bosholm's treatment plan on Friday, February 26, to the stuff of gross negligence as North Carolina recognizes it.

## 2. Deliberate Indifference[22]

Like North Carolina's tort of gross negligence, a § 1983 claim predicated on deliberate indifference to serious medical needs requires proof that the defendant acted

---

[22] At the outset, we note that applying FRE 601 in this case meant that the district court properly prohibited Dr. Bilbro from testifying about the standard of care and its breach with respect to Moreno's *state law* claims. That's because FRE 601 directs federal courts to apply state competency rules "regarding a claim or defense *for which state law supplies the rule of decision*." (emphasis added.)

(Continued)

Certainly, FRE 601 would not have prevented Dr. Bilbro from testifying about such matters with respect to Moreno's federal deliberate indifference claim. And the district court recognized as much by granting Dr. Bosholm's motion to exclude Dr. Bilbro's testimony "only to the extent that Dr. Bilbro seeks to testify as to the standard of care relevant to any medical malpractice claim under North Carolina law." J.A. 226. It likewise observed that he "may still testify as to other aspects of [Moreno's] claims" and it expressly reserved ruling on the admissibility of any other part of his medical testimony. J.A. 226; *accord* J.A. 256 (ruling at motion for reconsideration hearing).

Despite the limited nature of the court's ruling, it does not appear from the trial record that Moreno attempted to and yet was prohibited from introducing any evidence solely for purposes of establishing his deliberate indifference claim. For example, at no point during Dr. Bilbro's testimony—and in particular at no point when the court was ruling on objections to specific questions posed to this expert—did Moreno ever argue that the district court should overrule an objection because that testimony was admissible to support his deliberate indifference claim even though it had been deemed inadmissible as to his state-law claims.

Instead, the trial record shows that Moreno never raised the issue of whether any of Dr. Bilbro's testimony that was excluded was otherwise admissible for a limited purpose relating to establishing deliberate indifference. Indeed, the only discussion relates to the district court's concern that asking broad questions of Dr. Bilbro regarding the care that Moreno received from February 26th to 29th did not "give a clear picture" of "who . . . [was] responsible for the care" and how that might tie back to Dr. Bosholm. J.A. 299. After that point, Moreno was permitted to ask a series of follow-up questions that pinpointed what Dr. Bilbro observed about who was treating Moreno in his SCI medical records.

From this record we conclude that the district court did not exclude any of Dr. Bilbro's testimony based on its belief that it would have been inadmissible to support Moreno's deliberate indifference claim. Nor does Moreno challenge any trial ruling as doing so. Given that trial record, and because the district court's pre-trial ruling was correctly limited to what expert evidence was admissible to support Moreno's state-law claims, there's no basis for concluding that the district court's rulings were responsible for what evidence Moreno introduced at trial to support his deliberate indifference claim. Our review of that claim can thus rest squarely on the sufficiency of the evidence he presented at trial.

Last, we note that Dr. Bilbro's proffer as to the standard of care reveals that, even had he been permitted to testify on this matter, it would not have made a difference in this case. As discussed later in this opinion, "a deviation from the accepted standard of care, standing alone" will not establish the subjective prong of a deliberate indifference claim. *Jackson v. Lightsey*, 775 F.3d 170, 179 (4th Cir. 2014). More is required, and Moreno has pointed to nothing in Dr. Bilbro's proffer or expert evidence that would speak to that (Continued)

47

with a "sufficiently culpable state of mind," which amounts to something more than negligence but less than intention. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citation omitted); *accord Scinto*, 841 F.3d at 225. Specifically, the second part of a deliberate indifference claim requires proof that the defendant *both* knew of *and* disregarded a substantial risk to the plaintiff's health or safety. *Scinto*, 841 F.3d at 225 (stating that a deliberate indifference claim requires, inter alia, proof "that the official was aware of facts from which the inference could be drawn that a substantial risk of harm existed *and* drew that inference" (cleaned up) (emphasis in original)).[23] "Although this element is subjective, a deliberately indifferent state of mind can be proven through 'inference from circumstantial evidence.'" *Thompson*, 878 F.3d at 108 (quoting *Farmer*, 511 U.S. at 842). For example, a jury would be free to infer "that a prison official knew of a substantial risk [to the plaintiff's rights or safety] from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842; *see also Scinto*, 841 F.3d at 226 ("[A] prison official's failure to respond to an inmate's known medical needs raises an inference of deliberate indifference to those

---

something "more" that would create a jury question on whether Dr. Bosholm acted with deliberate indifference.

[23] The first part of a deliberate indifference claim is that the plaintiff was "exposed to 'a substantial risk of serious harm.'" *Thompson v. Commonwealth of Va.*, 878 F.3d 89, 97 (4th Cir. 2017) (quoting *Farmer*, 511 U.S. at 834). It's uncontested that Moreno suffered serious physical injury during his time at SCI.

48

needs. However, even officials who acted with deliberate indifference may be free from liability if they responded reasonably to the risk." (cleaned up)).[24]

Of particular import to this case, however, the Supreme Court has cautioned that the "inadvertent failure to provide adequate medical care" does not amount to deliberate indifference and that "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 105–06. Thus, "to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106. Applying these principles, the Supreme Court has held that a plaintiff did not state a cognizable deliberate indifference claim when the defendant treated his complaint, but the plaintiff asserted he'd been incorrectly "diagnos[ed] and inadequate[ly] treat[ed]" for that complaint. *Id.* at 107. Summarizing the basis of the plaintiff's claim as arguing "that more should have been done by way of diagnosis and treatment, and suggest[ing] a number of options that were not pursued," the Court recognized it to be "a classic example of a matter for medical judgment" and "[a]t most medical malpractice," not deliberate indifference. *Id.*

For this reason, this Court has similarly concluded that, "[i]n general, good-faith efforts to remedy the plaintiff's problems will prevent finding deliberate indifference,

---

[24] The heightened standards required to show deliberate indifference flow from it being a form of violating the Eighth Amendment's prohibition on the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. In other words, the Supreme Court has recognized deliberate indifference claims because the Eighth Amendment prohibits "the unnecessary and wanton infliction of pain," which only a prison official's "deliberate indifference to serious medical needs of prisoners" could entail. *Estelle*, 429 U.S. at 104 (cleaned up).

49

absent extraordinary circumstances." *Koon v. North Carolina*, 50 F.4th 398, 407 (4th Cir. 2022). That is why, for example, when "medical personnel examine and diagnose a patient, where they try to help but fail to live up [to] expectations, that is more naturally described as negligence than indifference." *Id.*

For the same reasons discussed with regard to his gross negligence claim, we reject Moreno's arguments in support of allowing his deliberate indifference claim to proceed to a jury verdict. The uncontradicted evidence shows that Dr. Bosholm responded to Moreno's complaints on Friday, February 26. Moreno says that response was inadequate, but "the mere negligent or inadvertent failure to provide adequate care is not enough" to establish deliberate indifference." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 198 n.5 (1989); *see Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) ("A missed diagnosis . . . does not automatically translate into deliberate indifference."). Faced with the hurdle that Dr. Bosholm provided responsive medical assessment and treatment, Moreno nonetheless argues that Dr. Bosholm should have known or surmised more about the risk that the symptoms he presented with on Friday would follow a particular trajectory *and* that the weekend medical staff would implement her instructions to "monitor" the quarantined inmates over the weekend in a way that failed to detect changes in his condition that *may* have been apparent before Monday. Those arguments seem to proceed backwards, looking at what could have been done to avoid the outcome and arguing that any other course of conduct by Dr. Bosholm on Friday constitutes deliberate indifference to his health. That's not how these claims operate. *See, e.g.*, *Johnson*, 145 F.3d at 168 (4th Cir. 1998) (observing that "[t]he correction question" in a deliberate indifference claim "is

50

whether the doctor subjectively 'knows of' the serious medical condition itself, not the symptoms of the serious medical condition," and that to satisfy both parts of the subjective prong of this claim, the plaintiff must come forward with evidence "that the doctor[] 'bridged the gap' between the symptoms and the [cause]," and then known that her response to that cause was inadequate (quoting *Farmer*, 511 U.S. at 837)).

At bottom, Moreno's speculation about an alternative approach to his treatment that could have averted his injuries is not the same thing as coming forward with evidence that would permit a jury to find that Dr. Bosholm deliberately disregarded a known risk to Moreno's health when she failed to provide more specific instructions to the weekend staff. And it's the latter that is required to proceed to a jury.

We have set out this difference in many cases, but *Jackson v. Lightsey*, 775 F.3d 170 (4th Cir. 2014), is particularly instructive. There, the plaintiff argued that a prison physician had been deliberately indifferent to his serious heart condition. *Id.* at 178. He alleged that the physician had screened and diagnosed him with a less serious heart condition than his outside cardiologist had diagnosed and been treating him. *Id.* The plaintiff also argued that during a screening appointment, he had "produced or offered to produce medical records showing that a cardiologist had diagnosed and treated him for a more serious medical condition" and had prescribed a different medication regimen than what the prison physician prescribed. *Id.* We held that this evidence did not demonstrate the prison physician acted in a manner that would satisfy a deliberate indifference claims' subjective prong. This was so because "[alt]hough hindsight suggests [the prison physician's] treatment decisions may have been mistaken, even gravely so, . . . [the claim] is essentially

51

a disagreement between an inmate and a physician over the inmate's proper medical care, and we consistently have found such disagreements to fall short of showing deliberate indifference." because while "a[n] . . . erroneous diagnosis . . . , as alleged by [the plaintiff], may well represent a deviation from the accepted standard of care, standing alone it is insufficient to clear the 'high' bar' of a constitutional claim." *Id.* at 178–79 (cleaned up). Similarly, here, Moreno failed to produce evidence that would permit a jury to find that Dr. Bosholm was deliberately indifferent—i.e., evidence that she subjectively knew Moreno faced a serious risk and also recognized that her response would be insufficient to meet his medical needs. *See Pfaller*, 55 F.4th at 445 (observing, in the deliberate indifference to serious medical needs context, a plaintiff must show, inter alia, that the defendant must subjectively "recognize[] that his actions were insufficient to mitigate the risk of harm to the inmate arising from his medical needs" (cleaned up)). For these reasons, the district court did not err in granting Dr. Bosholm judgment as a matter of law on Moreno's deliberate indifference claim.

### C.  Motion to Disqualify Moreno's Lead Appellate Counsel

Last, we explain our decision to deny Dr. Bosholm's motion to dismiss the appeal or, in the alternative, to disqualify Moreno's lead appellate counsel.[25] In her filing, Dr.

---

[25] Bosholm styled her filing as a petition for an extraordinary writ under Federal Rule of Appellate Procedure 21. That was a procedural mistake and we now recharacterize it to describe its proper form. An "extraordinary writ" is an original action authorized by the All Writs Act, 28 U.S.C. § 1651, and is the procedural mechanism a party invokes to ask this Court to order another governmental actor to do something (writs of mandamus) or refrain from doing something (writs of prohibition). But that is not what Dr. Bosholm sought. Instead, she asked this Court to take an action in this appeal. Such requests are (Continued)

Bosholm represented that she had recently learned that her opposing counsel clerked for the district judge assigned to Moreno's case while it was pending before that judge. Dr. Bosholm argued that he thus had "access to privileged, confidential information" about the case during his clerkship that created an "appearance of impropriety," if not an actual conflict of interest. Dr. Bosholm's Pet. at 6–7. Moreno's counsel responded to the petition by representing that he had no personal involvement with Moreno's case while he was clerking and that he had obtained no information about it during his clerkship. Moreno's Resp. to Pet. Ex. 2.[26]

North Carolina's ethical rules, which govern counsel's conduct in this appeal, do not bar Moreno's counsel's representation in this matter. Instead, its rule bars former law clerks from representing clients only "in connection with a matter in which the [clerk] participated personally and substantially." N.C. R. Prof. Conduct 1.12(a).

---

properly styled as motions under Federal Rule of Appellate Procedure 27. Rather than denying Dr. Bosholm's petition on this technical ground, we considered its substance as if it had been properly filed as a motion to dismiss or to disqualify opposing counsel.

[26] Moreno's counsel represented to the Court that he clerked for Judge Biggs from August 2021 to August 2022 and that during his clerkship, he "did not interact with Mr. Moreno's case in any capacity," "did not receive any confidential information (or any information whatsoever) about the case and did not discuss it with anyone," and "did not review any documents, conduct any research, or otherwise interact with the case in any way." Resp. to Pet. Ex. 2, at 2.

We have no reason to disbelieve this representation, sworn to the Court upon penalty of perjury. *Id.* at 4. During counsel's tenure as a clerk for the district judge, most of the docket entries regarding this case involved matters handled by the magistrate judge. The district court entered two orders that span three pages. And even though one of those orders adopted the magistrate judge's report and recommendations concerning summary judgment on the claims against Dr. Bosholm, we still have no basis on this record for rejecting counsel's representation that he did not personally work on this matter during his clerkship.

Similarly, the federal judiciary's Advisory Opinion assumes that "a former clerk must refrain from working on all cases in which he or she participated during the clerkship," but does not speak to a broader prohibition based on the former clerk's judge's participation in the case during the clerk's tenure. U.S. Courts, "Published Advisory Opinion No. 109: Providing Conflict Lists to Departing Clerks," *Guide to Judiciary Policy*, Vo. 2B, Ch.2 (July 2012) (last visited July 10, 2025), *available at* https://www.uscourts.gov/sites/default/files/2025-03/guide-vol02b-ch02.pdf [https://perma.cc/3C6D-G97A]. And while it acknowledges that a clerk "*may* be required by the judge, by court rule, or by attorney ethical rules to refrain from work on cases pending before the judge even if the law clerk had no personal involvement in them," *id.* (emphasis added), we are not aware of any such requirement restricting Moreno's counsel's representation under the circumstances. Unlike some circuit courts, this Court has not adopted a rule prohibiting representation based on a former law clerk's judge's—as opposed to the law clerk's personal—participation in a case. Nor has the district court or, to our knowledge, the district judge in question. Dr. Bosholm's best authority comes from a pamphlet distributed by the Federal Judicial Center warning clerks that they "may not participate in any matter that was pending before [their] judge during [their] clerkship." Federal Judicial Center, *Maintaining the Public Trust: Ethics for Federal Judicial Law Clerks* 26 (Rev. 4th ed. 2019). That pamphlet, in turn, cites the rules adopted in certain other courts—but notably not our own—containing a broader restriction on former law clerks participating in *any* matter pending before their judge during their clerkships.

54

We do not now debate the wisdom of adopting such a rule or a former law clerk's best ethical practice. For present purposes, it is enough to acknowledge that neither bar nor court rule governing Moreno's counsel barred his representation in this matter given that he did not personally participate in Moreno's case during the pendency of his clerkship. That is why we denied Dr. Bosholm's motion to dismiss the appeal or disqualify Moreno's lead appellate counsel.[27]

III.

For the reasons set forth above, we affirm the judgment of the district court.[28]

*AFFIRMED*

---

[27] We also note that Dr. Bosholm's eleventh-hour request sought relief that likely would have caused considerable prejudice to Moreno. Even if we found that counsel's conduct was "unbecoming a member of the bar of this Court," 4th Cir. Loc. R. 46(g)(1)(d), it would not have *ipso facto* warranted dismissal of Moreno's appeal or disqualification of counsel on the eve of oral argument.

[28] Given our disposition of Moreno's appeal, we do not consider Dr. Bosholm's cross-appeal, nor do we address the parties' threshold arguments concerning whether the cross-appeal was necessary or properly filed in the first instance.